FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
APRIL 23, 2020

*Stepee, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
APRIL 23, 2020

*Susan L. Carlson*
SUSAN L. CARLSON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 97268-1 |
| | ) | |
| v. | ) | |
| | ) | En Banc |
| ALEJANDRO ESCALANTE, | ) | |
| | ) | |
| Petitioner. | ) | Filed ___April 23, 2020___ |
| _____ | ) | |

GONZÁLEZ, J.— In our constitutional system of government, individuals have rights that the government and its agents must respect. Among those rights is the right to be free from compelled self-incrimination. U.S. CONST. amend V. To protect this constitutional right, no government agent may interrogate someone in custody without first warning them of their right to remain silent and their right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). If *Miranda* warnings are not given, incriminating statements that result may not be used as evidence in a criminal prosecution. *Id.*

In this case, Alejandro Escalante was detained for hours in a secured area at a border crossing and, the State concedes, interrogated by federal agents without *Miranda* warnings. Statements he made during that interrogation were used by the

1

State to convict him of drug possession. While a traveler briefly detained and questioned at the border is typically not in custody for *Miranda* purposes, the government's power to detain and question people at the border without implicating *Miranda* has limits. Here, those limits were reached. This border detention created the type of inherently coercive environment that demands *Miranda* warnings to ensure an individual's choice to speak is the product of free will. We hold that Escalante was in custody when he was interrogated and reverse.

FACTS

In August 2017, Escalante and three friends went to a music festival in Canada. Transcript of Proceedings at 20-21. On their way home to the United States, they passed through the Frontier border crossing station, where border patrol agents were searching all vehicles coming from the festival as part of a drug enforcement operation. *Id.* at 19-20, 32, 38. Since they told the first agent that they were coming from the festival, they were directed to the secondary inspection area, and border patrol agents took their documents. *Id.* at 13, 20-23, 32.

At secondary, an agent told the men to leave all their belongings in the van and wait in the secondary lobby. *Id.* at 22-23. The secondary lobby was an 11 x 14 foot secured room that was not accessible to the public or other travelers. *Id.* at 13-14. The door to the lobby was locked, with entry and exit controlled by an agent who sat inside the lobby behind a glass partition. *Id.* at 23, 28-29. Multiple

groups of travelers could be detained in the lobby at the same time if agents were searching multiple vehicles at once. *Id.* at 29. Once inside the secured lobby, those detained were not allowed to use the bathroom or access water without getting permission from agents and submitting to a pat-down search. *Id.* at 14-15, 26. Agents patted down all four men and found narcotics on the driver and one passenger, but not on Escalante or the other passenger. *Id.* at 35-36, 49-50. The driver and passenger with drugs were moved to 6 x 10 foot detention cells while Escalante and the other passenger continued to be held in the secured lobby. *Id.* at 18, 43-44, 48-49.

Agents kept all the men secured, either in the locked lobby or in the detention cells, for five hours while they searched the van. *Id.* at 45-46, 17. During this time, the agent behind the glass partition watched Escalante and kept his documents. *Id.* at 28-29. The search uncovered drug paraphernalia and personal items containing drugs, including a backpack with small amounts of heroin and lysergic acid diethylamide (LSD). *Id.* at 24, 40-41. Without giving *Miranda* warnings, agents confronted the men with each item of drug paraphernalia and each item in which drugs were found and asked who owned it. *Id.* at 24-25, 40-43, 49-50. Escalante admitted he owned the backpack. *Id.* at 42-43. At that time, Escalante and his companion were the only travelers in the secured lobby. *Id.* at 42. Border patrol agents contacted the United States

3

Attorney's Office through the Department of Homeland Security. *Id.* at 44-45.

After that office declined prosecution because the small quantity of drugs did not

meet the threshold for federal prosecution, agents summoned local law

enforcement and held Escalante until they arrived. *Id.* at 45. These officers

formally arrested Escalante and gave him *Miranda* warnings. *Id.*

Escalante was charged in state court with possession of heroin and LSD. He

moved to suppress his statement claiming ownership of the backpack because it

was obtained in custody by interrogation without *Miranda* warnings. The State

conceded that Escalante was interrogated but argued *Miranda* warnings were not

required because he was not, in the State's view, in custody at any time while

detained at secondary. The trial court admitted Escalante's incriminating

statement. Escalante was convicted at a stipulated facts trial. The Court of

Appeals affirmed. *State v. Escalante*, No. 35812-7-III (Wash. Ct. App. May 7,

2019) (unpublished).[1] We granted review. Order, *State v. Escalante*, No. 97268-1

(Wash. Oct. 4, 2019).

## ANALYSIS

Escalante does not challenge any of the trial court's findings of fact, making

them verities on appeal. *State v. Lorenz*, 152 Wn.2d 22, 30, 36, 93 P.3d 133

---

[1] https://www.courts.wa.gov/opinions/pdf/358127_unp.pdf.

(2004) (citing *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997)).

Whether Escalante was in custody is a question of law we review de novo. *Id.*

The Fifth Amendment guarantees that individuals will not be compelled by the government to incriminate themselves. U.S. CONST. amend. V.[2] "[O]ur accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth." *Miranda*, 384 U.S. at 460 (citing *Chambers v. Florida*, 309 U.S. 227, 235-38, 60 S. Ct. 472, 84 L. Ed. 716 (1940)). The Fifth Amendment protects an individual's right to remain silent, in and out of court, "'unless he chooses to speak in the unfettered exercise of his own will.'" *Id.* (quoting *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)).

In *Miranda*, the United States Supreme Court recognized that an individual interrogated while in custody is subjected to inherently compelling pressures "which work to undermine the individual's will to resist." 384 U.S. at 467. The Court explained that in-custody interrogations largely take place in an incommunicado police-dominated atmosphere where there is potential for physical brutality and psychological ploys aimed at inducing suspects to confess. *Id.* at

---

[2] Our state constitution also contains a guaranty of the privilege against self-incrimination. *See* WASH. CONST. art. I, § 9.

445-48.  Even in the absence of explicit coercion, when the government significantly curtails an individual's freedom of action, the individual may be effectively compelled to speak when, in a freer setting, they would exercise their right to remain silent.  *Id.* at 455-56.  To assure an individual freely makes the choice to talk to the police, *Miranda* requires that before custodial interrogation, the police inform a suspect of their right to remain silent and their right to the presence of an attorney, appointed or retained.  *Id.* at 479.  If *Miranda* warnings are not given before custodial interrogation, incriminating statements that result may not be used as evidence against the person who made the statements in a criminal prosecution.[3]  *Id.*

The parties agree that Escalante was interrogated.  Interrogation is questioning or conduct by the police that is "reasonably likely to elicit an incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)(footnote omitted).  Asking an individual to acknowledge ownership of an item containing drugs is interrogation.  *See State v. A.M.*, 194 Wn.2d 33, 40-41, 448 P.3d 35 (2019).  The only issue before

---

[3] The United States Supreme Court has carved out an "impeachment" exception to the rule that statements obtained without *Miranda* warnings are inadmissible.  *See Harris v. New York*, 401 U.S. 222, 225, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971); *Oregon v. Hass*, 420 U.S. 714, 723, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975).  That exception, which is not at issue in this case, allows the prosecution to introduce into evidence the defendant's statements that were voluntarily made— but obtained without *Miranda* warnings—to impeach the credibility of a testifying defendant.

us is whether Escalante was in custody for *Miranda* purposes at the time of that interrogation.

The *Miranda* court defined "custody" as "all settings in which [a person's] freedom of action is curtailed in any significant way." 384 U.S. at 467. Since then, the Court has narrowed "custody" to circumstances where "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983)). Therefore, even if a person is "seized" within the meaning of the Fourth Amendment—such that a reasonable person in their position would not feel free to leave or otherwise terminate the encounter with law enforcement—they are not necessarily in "custody" for *Miranda* purposes. *Id.*. at 442. Ultimately, in *Miranda* case law, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012).

The custody inquiry is an objective one that asks how a reasonable person in the suspect's position would have understood the circumstances. *Berkemer*, 468 U.S. at 442. To determine whether a reasonable person in the suspect's position would feel restrained to the degree associated with formal arrest, a court examines the totality of the circumstances. Relevant circumstances may include the nature

of the surroundings, the extent of police control over the surroundings, the degree of physical restraint placed on the suspect, and the duration and character of the questioning. *See, e.g.*, *United States v. Butler*, 249 F.3d 1094, 1099 (9th Cir. 2001); *United States v. Ventura*, 85 F.3d 708, 711 (1st Cir. 1996). The subjective views of the interrogating officers are irrelevant, except to the extent those views are communicated to the suspect in some way and would influence a reasonable person's perception of the situation. *Stansbury v. California*, 511 U.S. 318, 323-25, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994).

In *Berkemer*, the Court concluded that a person detained during a traffic stop was not in custody for *Miranda* purposes. 468 U.S. at 442. The Court reasoned that "[t]wo features of an ordinary traffic stop mitigate the danger" that a person will be compelled to speak against their will. *Id.* at 437. First, an ordinary traffic stop is "presumptively temporary and brief," in contrast to the frequently prolonged station house interrogations, which were addressed in *Miranda*. *Id.* at 437-38. Second, the atmosphere surrounding an ordinary traffic stop is substantially less police-dominated than the interrogations in *Miranda*. *Id.* at 438-39. A driver is typically confronted by one or at most two police officers, and "most importantly, the typical traffic stop is public," so that "[p]assersby, on foot or in other cars, witness the interaction of [the] officer and motorist." *Id.* at 438. The public nature of a typical roadside stop reduces the ability of a police officer to

use improper means to elicit a confession and reduces a driver's fear that they will be abused if they do not cooperate. *Id.* Overall, the Court concluded the traffic stop in *Berkemer*, during which the individual was asked a modest number of questions by a single police officer and asked to perform a field sobriety test, did not subject him to restraints comparable to formal arrest and did not present the same inherently coercive pressures as the type of questioning in *Miranda*. *Id.* at 441-42.

The United States Supreme Court has not addressed what circumstances render a person in custody at the border. The State essentially argues that because the detention was constitutional under the Fourth Amendment, Escalante was not in custody for Fifth Amendment *Miranda* purposes. *See* Suppl. Br. of State of Wash. at 2-4. But Escalante did not bring a Fourth Amendment challenge, and whether Escalante's detention was a reasonable seizure under the Fourth Amendment is not at issue. By relying on Fourth Amendment doctrine, the State's argument merges two distinct constitutional questions.

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. CONST. amend. IV. In the absence of a warrant supported by probable cause, a search or seizure is reasonable only if it falls within one of the narrow exceptions to the warrant requirement. *Riley v. California*, 573 U.S. 373, 382, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014). Border searches and seizures are

9

one such long-standing exception. *United States v. Ramsey*, 431 U.S. 606, 616-21, 97 S. Ct. 1972, 52 L. Ed. 2d 617 (1977). Because "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border," *United States v. Flores-Montano*, 541 U.S. 149, 152, 124 S. Ct. 1582, 158 L. Ed. 2d 311 (2004), border searches are generally deemed "reasonable simply by virtue of the fact that they occur at the border," *Ramsey*, 431 U.S. at 616. "Routine" searches and seizures at the border are not subject to any requirement of individualized suspicion. *United States v. Montoya de Hernandez*, 473 U.S. 531, 538, 105 S. Ct. 3304, 87 L. Ed. 2d 381 (1985). But "in the case of highly intrusive" searches and seizures at the border, the "dignity and privacy interests of the person being searched" may demand some level of suspicion. *Flores-Montano*, 541 U.S. at 152. The touchstone for whether the circumstances of a border detention are permissible under the Fourth Amendment is reasonableness, which requires balancing an individual's privacy interest against the government's interest in protecting the border, keeping in mind that the balance is "struck much more favorably to the Government" at the border than in the interior. *Montoya de Hernandez*, 473 U.S. at 539-40.

In contrast to the Fourth Amendment reasonableness inquiry, the *Miranda* custody inquiry does not involve balancing the needs of the government against the interests of the individual. The inquiry simply asks, when examining the totality of

10

the circumstances, whether an individual was put in an environment that

"present[s] a serious danger of coercion." *Howes*, 565 U.S. at 508-09; *see, e.g.*,

*United States v. Smith*, 3 F.3d 1088, 1096-97 (7th Cir. 1993) (explaining the

different focus of the two constitutional questions). Accordingly, whether a

seizure is reasonable under the Fourth Amendment is irrelevant to whether

*Miranda* warnings are required. *E.g.*, *United States v. Ali*, 68 F.3d 1468, 1473 (2d

Cir.1995), *modified on reh'g*, 86 F.3d 275 (1996); *Smith*, 3 F.3d at 1097 (noting

that when it comes to *Miranda*, "[p]olice officers have much less discretion than in

Fourth Amendment cases"). The distinction between the Fourth Amendment

analysis and the Fifth Amendment analysis is why in *United States v. FNU LNU*,

the Second Circuit Court of Appeals declined to hold that "routine" border

searches are per se noncustodial. 653 F.3d 144, 148-52 (2d Cir. 2011). Though

the circumstances of a border detention may be reasonable given the government's

interest in preventing contraband from entering the country, those circumstances

may nevertheless inflict the type of pressures that were the concern of *Miranda*.

In the analogous context of *Terry*[4] stops, many circuit courts have found a

custodial environment requiring *Miranda* warnings even though the circumstances

were reasonable under the Fourth Amendment. *See Ali*, 68 F.3d at 1473 ("The fact

---

[4] *Terry v. Ohio*, 392 U.S. 1, 5, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

that the seizure and search of a suspect comports with the Fourth Amendment

under *Terry* simply does not determine whether the suspect's contemporaneous

oral admissions may be used against [them] at trial."); *Smith*, 3 F.3d at 1096-97;

*United States v. Perdue*, 8 F.3d 1455, 1465-66 (10th Cir. 1993); *see also United*

*States v. Kim*, 292 F.3d 969, 976-78 (9th Cir. 2002) (concluding that a woman

detained during the execution of a search warrant was in custody for *Miranda*

purposes even though the circumstances of the detention were reasonable under the

Fourth Amendment).  Under *Terry*, a law enforcement officer may temporarily

detain an individual suspected of criminal activity if the officer can point to

"specific and articulable facts which, taken together with rational inferences from

those facts, reasonably warrant that intrusion."  392 U.S. at 21.  During a *Terry*

stop, officers may ask the detained individual questions in order to dispel or

confirm their suspicions, *Florida v. Royer*, 460 U.S. 491, 498, 103 S. Ct. 1319, 75

L. Ed. 2d 229 (1983)(plurality opinion), and can "take such steps as [are]

reasonably necessary to protect their personal safety," *United States v.*

*Hensley*, 469 U.S. 221, 235, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985).  As the Court

explained in *Berkemer*, an ordinary *Terry* stop generally does not render a person

in custody for *Miranda* purposes because "the typical police-citizen encounter

envisioned by the Court in *Terry* usually involves no more than a very brief

detention . . . , a few questions relating to identity and the suspicious

12

circumstances, and an atmosphere that is 'substantially less "police dominated" than that surrounding the kinds of interrogation at issue in *Miranda.*'" *Perdue*, 8 F.3d at 1464 (quoting *Berkemer*, 468 U.S. at 439). But if, during a valid *Terry* stop, police officers "take highly intrusive steps" that are justified under the Fourth Amendment by the need to protect themselves from danger, they may create the type of custodial environment that requires them to "provide protection to their suspects by advising them of their constitutional rights." *Id.* at 1465. In the same way, if federal agents take extensive measures to prevent contraband from entering our borders, and in so doing create a custodial environment, they must give *Miranda* warnings.

Indeed, circuit courts have concluded that while a traveler is generally not in custody during a typical detention at a fixed border checkpoint, a court must still evaluate the totality of the circumstances to determine if a border detention is custodial. *See FNU LNU*, 653 F.3d at 153-54; *see United States v. Chavira*, 614 F.3d 127, 133-34 (5th Cir. 2010); *Butler*, 249 F.3d at 1099; *United States v. Ozuna*, 170 F.3d 654, 659 (6th Cir. 1999); *Ventura*, 85 F.3d at 711; *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996). A person stopped at a fixed border checkpoint is seized within the meaning of the Fourth Amendment. *See United States v. Bengivenga*, 811 F.2d 853 (5th Cir. 1987), *rev'd on other grounds on reh'g*, 845 F.2d 593, 598 (1988). But courts have reasoned that a typical border

seizure generally does not render a person in custody because travelers approaching the border anticipate being stopped and are required to answer a brief series of questions about their "citizenship, authorization to enter the country, destination, baggage, and so on." *FNU LNU*, 653 F.3d at 154; *see United States v. Leasure*, 122 F.3d 837, 840 (9th Cir. 1997). The fact that a traveler expects a brief detention and that at least initially, every traveler must submit to the same sort of questioning, reduces the potentially coercive character of the encounter. *See FNU LNU*, 653 F.3d at 154; *Ozuna*, 170 F.3d at 659 (citing *Ventura*, 85 F.3d at 711); *Delaware v. Prouse*, 440 U.S. 648, 657, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979) (noting the psychological impact of official intrusion is lessened when "all are subjected to a show of police power of the community"). A typical detention at a fixed border checkpoint, like the ordinary traffic stop in *Berkemer*, is brief, subject to the scrutiny of other travelers, conducted by only one or two agents, and limited in scope. *See Bengivenga*, 845 F.2d at 598-99. Nevertheless, "[a]s in the traffic-stop context, the inquiry remains a holistic one in which the nature and context of the questions asked, together with the nature and degree of restraints placed on the person questioned, are relevant." *FNU LNU*, 653 F.3d at 154 (citing *Berkemer*, 468 U.S. at 441 n.34).

In *United States v. Pratt*, for example, the First Circuit evaluated the totality of the circumstances and concluded a particular border detention was not custodial

14

because of the limited and routine nature of the questioning and the short duration of the encounter. 645 F.2d 89, 91 (1st Cir. 1981). Customs agents routed Pratt to a secondary inspection area because he was traveling from a country known as a source of drugs, he purchased his airline ticket in cash, and he wore bulky clothes. *Id.* at 90. Agents conducted a pat-down search, inspected Pratt's luggage and documents, and questioned him about an airline ticket receipt they found bearing a different name. *Id.* The entire inspection lasted 15 minutes, and Pratt was allowed to go on his way afterward. *Id.* The court emphasized that no events signaled to Pratt a high and evident degree of suspicion by agents—for example, they did not discover contraband during their search. *Id.* at 91. In light of the limited and routine nature and duration of questioning, the fact that Pratt was subjected to a pat-down search was not sufficient to render him in custody. *Id.* at 90-91.

Similarly, in *United States v. Harrell*, the Fifth Circuit held the defendant was not in custody at an immigration checkpoint because he had been detained only for a few minutes, was not told he was suspected of any crime, suffered no physical restraints comparable to formal arrest, and was questioned in a glass conference area in public view. 894 F.2d 120, 124-25 (5th Cir. 1990).

On the other hand, in *Chavira*, the Fifth Circuit found a woman was in custody when she was detained after arriving at the border with a teenager she claimed was her daughter. 614 F.3d at 133. Agents were suspicious about the

teenager's citizenship and routed the pair to secondary—a secured trailer not accessible to the public. *Id.* at 129-30. Agents took Chavira's birth certificate and other identification, separated her from the teenager, handcuffed one of her hands to a chair, and subjected her to accusatory questioning in a 14 x 10 foot room for 30 to 40 minutes. *Id.* at 129-31. The Fifth Circuit emphasized that (1) the questioning was accusatory, (2) the restraint on Chavira's freedom of movement was significant because she was handcuffed to a chair and questioned in a small windowless room, and (3) the detention took place out of public view in a police-dominated setting. *Id.* at 134-35. In *Butler*, the Ninth Circuit concluded a defendant was in custody when border agents routed him to secondary, subjected him to a pat-down search, confiscated his shoes and belt, and placed him in a holding cell while agents searched his car. 249 F.3d at 1096-97; *see United States v. Doe*, 219 F.3d 1009, 1014 (9th Cir. 2000).

Examining the totality of the circumstances here, we conclude that Escalante was in custody when he was interrogated about the backpack. After answering questions at the primary inspection area, Escalante was separated from the normal stream of traffic and routed to a secondary inspection area, which would cause a reasonable person to feel subject to an increased level of suspicion. At secondary, agents separated him from all his belongings, confiscated his documents, subjected him to a pat-down search, and detained him for five hours in a locked 11 x 14 foot

lobby that was inaccessible to the public or other travelers. *Compare Chavira*, 614 F.3d at 134-35 (defendant in custody when questioned in windowless, secured area that was not accessible to the public), *with Harrell*, 894 F.2d at 125 (defendant not in custody when questioned in glass conference area in public view). Agents controlled entry and exit of the lobby, and although agents had discretion to detain multiple groups in the lobby at the same time, other travelers could not come in at will. Escalante was not allowed to leave the lobby or to freely use the bathroom or access water. These circumstances imposed a significant degree of physical restraint and created precisely the type of incommunicado police-dominated environment that was the concern of *Miranda*. Although the presence of other travelers at the discretion of agents may have rendered Escalante somewhat less isolated than the suspects in *Miranda*, their presence is not the type of meaningful "exposure to public view" that "reduces the ability of an unscrupulous [police officer] to use illegitimate means to elicit self-incriminating statements and diminishes the [suspect's] fear that, if he does not cooperate, he will be subjected to abuse." *Berkemer*, 468 U.S. at 438 (traffic stop on a public thoroughfare).

Escalante was detained in this secure setting for five hours, which also suggests he was in custody. Courts have repeatedly emphasized that the brief duration of a detention may help mitigate other coercive aspects of the encounter. *See Pratt*, 645 F.2d at 91 (emphasizing the relatively brief 15-minute duration);

*Harrell*, 894 F.2d at 124-25 (incriminating statements were made after only a few minutes of detention); *United States v. Hudson*, 210 F.3d 1184, 1192-93 (10th Cir. 2000) (the fact that defendant's documents were confiscated did not render him in custody because the detention lasted only 8-10 minutes). But here, the lengthy duration of Escalante's detention contributed to its coercive atmosphere. Further, while the agent's specific question about the backpack was not distinctly accusatory, agents confronted Escalante with each personal item from the van, including drug paraphernalia, one by one—a procedure that, under the circumstances, would communicate to a reasonable person that they were under increased suspicion. And, by the time of the questioning, the driver of the van had been restrained in a detention cell, leaving Escalante without a means to leave even if he had been permitted. A reasonable person in Escalante's circumstances would have felt their freedom was curtailed to the degree associated with formal arrest.

The detention in this case is a far cry from the noncustodial secondary inspection in *Pratt* where the defendant was patted down, asked routine questions, and detained for only 15 minutes. *See* 645 F.2d at 90-91. The facts here also go well beyond those in *Harrell*, where, at the time of the incriminating statements, the defendant had been detained for only a few minutes and was questioned in a glass conference area in public view. *See* 894 F.2d at 125. Although Escalante was not handcuffed like in *Chavira* and *Butler*, he was nevertheless subjected to

18

significant restraint on his freedom of movement while detained in a small locked area without freedom to come and go. Given the degree of restraint on Escalante's freedom, the government cannot render this environment noncustodial merely by putting out brochures and calling the room a lobby instead of a holding cell.

CONCLUSION

Evaluating the totality of the circumstances, we conclude that a reasonable person in Escalante's circumstances would have felt their "freedom of action [was] curtailed to a 'degree associated with formal arrest.'" *Berkemer*, 468 U.S. at 440 (quoting *Beheler*, 463 U.S. at 1125). Agents confiscated Escalante's documents, routed him to a secondary inspection area, separated him from his belongings, arrested the driver of the van in which he was traveling, and detained him for five hours in a small locked lobby that was not accessible to the public or other travelers. After a lengthy detention, he was questioned using a procedure that communicated agents had found drugs and were suspicious of him. These circumstances created precisely the type of incommunicado police-dominated environment that was the concern of *Miranda*. We hold that Escalante was in custody and his unwarned statements should have been suppressed. We reverse, vacate the convictions, and remand for further proceedings consistent with this opinion.

González, J.

WE CONCUR:

Stephens, C.J.

Wiggins, JPT

Johnson, J.

Gordon McCloud, J.

Madsen, J.

Yu, J.

Owens, J.

Montoya-Lewis, J.