IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 86614-1-I |
| Respondent, | |
| v. | DIVISION ONE |
| SAMMY ERIC PETERSEN, | UNPUBLISHED OPINION |
| Appellant. | |

CHUNG, J. — Sammy Petersen appeals his conviction for vehicular homicide, following an accident in which a motorcyclist was killed. Petersen challenges his conviction based on violations of his Miranda[1] rights and insufficient evidence. He further asserts the trial court erred by not awarding him credit for time served pretrial on electronic home monitoring. Additionally, in a statement of additional grounds for review (SAG), Petersen claims ineffective assistance of counsel. We conclude there was no error and affirm the conviction and sentence.

FACTS

On April 25, 2021, Sammy Petersen was in a collision on State Route 7 that resulted in the death of motorcyclist Scott Beschta. It was around sunset at the time and it was starting to get dark. Another driver who was on the same stretch of road at the time of the accident, Evan Charleston, testified that he saw

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

a car in his rearview mirror passing other cars. He estimated the car's speed at 100 miles per hour, given how quickly it caught up to him. Charleston testified the car began to pull out around him when it collided with a motorcycle in the oncoming lane.

A fire truck, an ambulance, and officers from the Pierce County Sheriff's Office and Washington State Patrol (WSP) responded to the scene. One of the investigators, WSP Trooper Shannon Beeler, observed the area of the incident was a "two-lane state route" with a "double-yellow center line separat[ing] both lanes," and the northbound lane went uphill, with a "sweeping curve to the right." Her findings included that Petersen's car was traveling in the southbound lane of travel when it lost control, went sideways, and collided with oncoming traffic. Evidence from the scene indicated it was a high-speed collision and the car was traveling faster than the posted limit of 55 miles per hours.

Trooper Ian Morhous, a certified technical specialist in collision reconstruction with WSP, also responded to the scene. Morhous testified Petersen's vehicle appeared to travel into the wrong lane, and then shortly before the roadway straightened out, the vehicle started to rotate and collided with the motorcycle traveling in the southbound lane. The type of damage Morhous observed at the scene was of the type typically associated with high-speed collisions.

Petersen was extracted from his Honda Civic and transported to an ambulance for medical aid. At about 9:15 p.m., shortly after he arrived at the scene, WSP Trooper Jamon York contacted Petersen, who was at that point in

2

the ambulance. York was able to interact with Petersen through a side door of the ambulance. York further testified that multiple other people were in the ambulance with Petersen as they were treating him. Upon first speaking with Petersen, York identified himself and stated that the contact was being recorded, told Petersen he had been in an accident, and asked him if he had been drinking. According to York, this last question was part of a standard procedure in investigations of collisions that involve serious injury or fatalities. Petersen first appeared confused and responded, "What collision?" Asked a second time if he had been drinking, Petersen responded that he drank whiskey earlier that day. During this interaction, York noticed Petersen's eyes were bloodshot and watery and that his face was flushed in color, indicating he was perhaps under the influence of alcohol. York terminated the interaction within a few minutes, as paramedics made it clear they needed to get Petersen to the hospital. York then followed the ambulance to St. Joseph's Hospital.

York arrived at the hospital 20 to 25 minutes later. He testified that when he first entered Petersen's room, there were five to seven people working on Petersen, and they were speaking amongst themselves. York further testified he was able to observe the same indicators of possible intoxication that he had previously observed. At that point, York placed Petersen under arrest for driving under the influence and proceeded to read Petersen his Miranda rights. York testified that Petersen indicated he understood those rights, he did not express any confusion regarding his rights, and agreed to speak to law enforcement.

3

Because the collision involved a fatality, WSP Sergeant Joe Gannon, a drug recognition expert, was assigned to contact Petersen. Gannon spoke with York on the phone and asked York if he had probable cause for the arrest. Then, at the hospital, Gannon met with York and confirmed York had probable cause and had advised Petersen of his rights approximately 15 minutes earlier. Gannon did not reread Petersen his Miranda rights, as York told Gannon he had just read them to Petersen. Gannon introduced himself to Petersen and told him he was there to speak to him as a drug recognition expert. According to Gannon, Petersen did not display any confusion regarding his rights and assented to answering questions.

Petersen told Gannon that after dropping off his children in Eatonville, Washington he was traveling on State Route 7. He said a silver vehicle attempted to pass him at a high rate of speed and there was another vehicle following him very closely. While between these two vehicles, the silver car ahead of him applied its brakes suddenly at the bottom of a turn, forcing him to take evasive action to avoid a collision.

Petersen also admitted to Gannon that he had had four shots of whiskey earlier in the day from approximately 1:00 to 3:20 p.m. Petersen also consented to Gannon's administering a horizontal gaze nystagmus (HGN) test.[2] Gannon testified that Petersen exhibited six out of six clues on the HGN test. He further

---

[2] "Nystagmus is the involuntary oscillation of the eyeballs, which results from the body's attempt to maintain orientation and balance." State v. Baity, 140 Wn.2d 1, 19 n.3, 991 P.2d 1151 (2000). "HGN is the inability of the eyes to maintain visual fixation as they turn from side to side or move from center focus to the point of maximum deviation at the side." Id.

reported noticing other indicators of intoxication, including bloodshot, watery eyes and an angled onset at about 35 degrees.

The State initially charged Petersen with vehicular homicide by two alternative means, alleging he drove his vehicle "while under the influence of intoxicating liquor and/or drugs" or "operate[d] a motor vehicle in a reckless manner," and that while so operating the vehicle, he caused injuries to Beschta that resulted in his death. The State filed an amended information on November 7, 2022, which added a third alternative means of committing vehicular homicide to the charge, driving with a disregard for the safety of others.

The State moved to admit Petersen's statements to York in the ambulance and to Gannon at the hospital under CrR 3.5. After hearing testimony, regarding the ambulance interaction, the trial court found while in the ambulance, Petersen was contacted by York; York testified that others were around the ambulance and he approached Petersen from a side door; and York was about four feet away from the defendant and was outside of the ambulance. Further, the court found York asked Petersen several questions about consuming alcohol, which was York's general practice in serious accidents, and York was able to speak to Petersen only for a few minutes. Based on these facts, the trial court concluded Petersen was not in custody at the time he made statements in the ambulance and, thus, those statements were admissible.

Additionally, regarding the hospital interaction, the trial court found that shortly after York arrived, he placed Petersen under arrest and read him his Miranda rights; Petersen acknowledged and waived those rights; and York

5

indicated the waiver on a preprinted form. The court found that York then left the hospital room to draft a warrant for a blood sample and passed Gannon in the hallway of the hospital, and Gannon spoke to Petersen within 15 minutes of York's reading Petersen his <u>Miranda</u> warnings. During this interaction, Gannon asked Petersen questions about his consumption of alcohol and the collision. Finally, the court found that Petersen did not express any confusion about his <u>Miranda</u> rights during the questioning by Gannon. Thus, regarding the statements Petersen made at the hospital, the court concluded Petersen knowingly, intelligently, and voluntarily waived his rights, and the time period between when York read Petersen his rights and Gannon speaking to him was too short to necessitate a second reading of <u>Miranda</u> rights. The trial court concluded, "For purposes of <u>Miranda</u>, statements made by [Petersen] post <u>Miranda</u> waiver regarding consumption of alcohol and details of the collision are admissible."

The jury found Petersen guilty of vehicular homicide. The jury also returned a special verdict indicating that it was "not unanimous" as to the first means, whether Petersen operated a motor vehicle while under the influence of intoxicants, but that it found Petersen guilty as to the other two means, i.e., it found that at the time of causing the injury resulting in death, Petersen was (1) operating a motor vehicle in a reckless manner and (2) operating a motor vehicle with disregard for the safety of others.

The court imposed a standard range sentence of 78 months, followed by 18 months of community custody. Petersen requested the court award him credit

for time spent on electronic home monitoring (EHM), which the court declined to do.

Petersen timely filed a notice of appeal.

DISCUSSION

Petersen challenges his convictions based on the admission of his statements to York and Gannon, which he claims violated his Miranda rights because he was in custody when he made initial inculpatory statements, and because he did not knowingly, intelligently, and voluntarily waive his rights after being arrested. He additionally challenges the sufficiency of the evidence for his conviction and asserts the trial court erred when it denied him credit for time served on a form of electronic home monitoring. Finally, through a SAG, Petersen claims ineffective assistance of counsel for several reasons.

I.      Admission of Petersen's Statements to Police

The federal and Washington State Constitutions guarantee the right against self-incrimination. U.S. CONST. amends. V, VI, XIV; WASH. CONST. art. I, § 9. Miranda warnings were developed to protect the right against self-incrimination "while in the coercive environment of police custody." State v. Heritage, 152 Wn.2d 210, 214, 95 P.3d 345 (2004). "Even in the absence of explicit coercion, when the government significantly curtails an individual's freedom of action, the individual may be effectively compelled to speak when, in a freer setting, they would exercise their right to remain silent." State v. Escalante, 195 Wn.2d 526, 532, 461 P.3d 1183 (2020) (citing Miranda, 384 U.S. at 455-56). Thus, Miranda requires that before a custodial interrogation, the

police must inform a suspect of their right to remain silent and their right to the presence of an attorney. Escalante, 195 Wn.2d at 532.

Without Miranda warnings, incriminating statements made during custodial interrogation may not be used as evidence against the person in a criminal trial. Escalante, 195 Wn.2d 532. To determine whether a statement obtained in a custodial interrogation is admissible, the court must "ascertain whether the accused in fact knowingly and voluntarily decided to forgo [their] rights to remain silent and to have the assistance of counsel." State v. Unga, 165 Wn.2d 95, 100, 196 P.3d 645 (2008) (quoting Fare v. Michael C., 442 U.S. 707, 724-25, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979)).

Here, Petersen challenges the court's admission of statements he made to officers at two different points: first, while he in the ambulance, before being given Miranda warnings, and, second, after York read him his rights, while he was in the hospital.

A.  Whether Petersen Was in Custody While Questioned in the Ambulance

Petersen claims the trial court erred by concluding he was not in custody when questioned by York in the ambulance. York asked Petersen several questions about how much alcohol Petersen possibly consumed that day. Petersen was initially confused concerning the questioning but eventually responded that he drank a shot of whiskey earlier that day. Petersen argues York questioned him as part of a criminal investigation, which signaled Petersen was not free to leave. The State contends that the fact that the restriction of Petersen's movement was not police-created is dispositive in determining

Petersen was not in custody. We agree with the State that York's questioning of Petersen in the ambulance was not a custodial interrogation.

Petersen does not challenge any of the trial court's findings of fact, so they are verities on appeal. See State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994) (unchallenged findings of fact are considered verities on appeal). Whether Petersen was in custody is a question of law the court reviews de novo. See State v. Lorenz, 152 Wn.2d 22, 30, 36, 93 P.3d 133 (2004).

In the context of Miranda, "custodial" refers to "whether the defendant's movement was restricted at the time of questioning." Lorenz, 152 Wn.2d at 36. The objective measure of custody is whether a reasonable person would believe they are in custody "to a degree associated with formal arrest." Id. at 36-37. The court considers the totality of the circumstances, including the "nature of the surroundings, the extent of police control over the surroundings, the degree of physical restraint placed on the suspect, and the duration and character of the questioning." Escalante, 195 Wn.2d at 534. Whether questioning occurs in public can also be relevant. Id. (noting that the public nature of a roadside stop "reduces the ability of a police officer to use improper means to elicit a confession and reduces a driver's fear that they will be abused if they do not cooperate"). "The subjective views of the interrogating officers are irrelevant, except to the extent those views are communicated to the suspect in some way and would influence a reasonable person's perception of the situation." Id. The custody inquiry simply asks "whether an individual was put in an environment that 'present[s] a serious

danger of coercion.' " Id. at 536 (quoting Howes v. Fields, 565 U.S. 499, 508-09, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012)).

The State relies on two cases to support its argument that when police do not cause the restraint, the defendant is not in custody. First, in State v. Kelter, the defendant was interviewed in his hospital room the day following a car crash that resulted in two fatalities. 71 Wn.2d 52, 53, 426 P.2d 500 (1967). The court held the defendant was not in custody despite being confined to his hospital room because "there was no compelling atmosphere of in-custody interrogation[,] . . . no competent evidence was offered to show that the defendant was not in full possession of his faculties," and the defendant was not "placed under arrest or otherwise restrained by the police in any manner." Id. at 54.[3]

Similarly, in State v. Butler, when the defendant was interviewed by the police, he was bed-bound in a hospital due to two gunshot wounds in association with a robbery. 165 Wn. App. 820, 828, 269 P.3d 315 (2012). He was in a coma for several days before police could speak to him. Id. at 825. The nurse assigned to the defendant controlled access to him, and he concluded the defendant was well enough to speak to detectives despite being on pain medication and required to lay flat in bed. Id. The court held that when considering the totality of

---

[3] Petersen argues Kelter is not controlling because the defendant in that case was tried before Miranda was decided, and, thus, the analysis was under the exclusionary rule announced in Escobedo v. Illinois, 378 U.S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977 (1964). See Kelter, 71 Wn.2d at 53 ("we are only concerned on this appeal with the rule as announced in Escobedo"). However, the court also noted that "[c]ustodial interrogation is an essential element of the Escobedo exclusionary rule" because in Miranda, "the court re-asserted its tenets." Kelter, 71 Wn.2d at 54. Moreover, the court in State v. Butler, a 2012 post-Miranda decision, relied on the Kelter court's reasoning to arrive at the conclusion that the defendant was not in custody. 165 Wn. App. 820, 827-28, 269 P.3d 315 (2012).

the circumstances, the defendant was not in "custody," because, like the defendant in Kelter, Butler "was restricted to his hospital room because of his injuries" and not by the police. Id. at 828. Additionally, the defendant was not under arrest, and there were not any police stationed inside or outside his room. Id. The court reasoned this interaction did not amount to the type of police-dominated atmosphere against which Miranda was intended to protect. Id. Instead, " '[c]ustody' depends on 'whether the defendant's movement was restricted at the time of questioning,' and necessarily that the police restricted that movement." 165 Wn. App. at 827 (quoting State v. Lorenz, 152 Wn.2d at 36-37).

Considering the totality of the circumstances, we conclude that Petersen was not in custody for Miranda purposes when questioned by York while on a gurney in the back of an ambulance. Similar to the defendants in Kelter and Butler, Petersen was restricted at the time of questioning not by police, but because of his own medical needs. Even though there were numerous other people present at the accident scene, including WSP investigators, they were there to address other aspects of the accident. Petersen's environment was not "police-dominated"; York was the only officer directly engaged with questioning Petersen, and he was outside the ambulance approximately four feet away from Petersen.[4] Petersen was not under any physical restraint by police, such as handcuffs, nor was he formally arrested. York asked minimal questions. The

---

[4] Petersen also asserts there was more than one State patrol trooper present during this interaction. However, Petersen's citation to the record is not accurate on this point, and this fact was not in the trial court's findings of fact, York's testimony or Petersen's testimony.

presence of other non-police personnel, approximately three paramedics who were working on him, and the public nature of the questioning further reduced the likelihood of improper means to elicit a confession. A reasonable person under these circumstances would not believe they were in custody to a degree associated with formal arrest. Thus, the court properly admitted York's testimony about Petersen's responses to questioning while he was in the ambulance.

B.  Whether Petersen Waived His *Miranda* Rights in the Hospital

Petersen also contends the trial court erred by concluding he had made a knowing, voluntary, and intelligent waiver of his Miranda rights before speaking with Gannon at the hospital. The State counters that Petersen was correctly advised of his constitutional rights, did not indicate confusion concerning those rights, and subsequently waived those rights. We agree with the State.

Again, Petersen does not challenge any of the trial court's relevant findings of fact, so they are verities on appeal. See Hill, 123 Wn.2d at 644. As Petersen challenges the court's ruling only to the extent that he claims the court erred in its legal conclusion that Petersen's waiver of Miranda was voluntary, our review is de novo. State v. Campos-Cerna, 154 Wn. App. 702, 708 n.4, 226 P.3d 185 (2010) (when defendant challenged the findings and conclusions "to the extent that the trial court erred in its legal view of the Miranda waiver's additional juvenile advisement of rights language, our review [wa]s de novo").

"[A] confession is voluntary, and therefore admissible, if made after the defendant has been advised concerning rights and the defendant then knowingly, voluntarily and intelligently waives those rights." State v. Aten, 130 Wn.2d 640,

663, 927 P.2d 210 (1996) (citing Miranda, 384 U.S. 436). "To be voluntary for due process purposes, the voluntariness of a confession is determined from a totality of the circumstances under which it was made." Id. at 663-64. We consider factors including "a defendant's physical condition, age, mental abilities, physical experience, and police conduct." Id. at 664. The State bears the burden to show that the suspect knowingly, intelligently, and voluntarily waived their Miranda rights. State v. Athan, 160 Wn.2d 354, 380, 158 P.3d 27 (2007).

Petersen relies on Mincey v. Arizona, 437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978), to assert he was not well enough to voluntarily waive his constitutional rights, and instead his will was overborne. There, a detective repeatedly questioned the defendant, Mincey, despite Mincey's being seriously wounded just a few hours earlier and "depressed almost to the point of coma." Id. at 398. Mincey was unable to provide coherent answers, as evidenced by review of his written responses, and was heavily encumbered by tubes, needles, and breathing apparatus. Id. at 399. He also repeatedly asked not to be interrogated. Id. The Court held that the statements Mincey eventually made were not voluntary, reasoning that Mincey clearly did not want to answer the detective's questions, but "weakened by pain and shock, isolated from family, friends, and legal counsel, and barely conscious, [Mincey's] will was simply overborne." Id. at 401-02.

However, a suspect's will is not always overborne simply by the fact that he is questioned while in pain or under the effect of medication. See State v. Peerson, 62 Wn. App. 755, 774, 816 P.2d 43 (1991); United States v. George,

13

987 F.2d 1428, 1430 (9th Cir. 1993). For example, in Peerson, the defendant sought to suppress statements he made while in the hospital, including conversations overheard by the 24-hour surveillance team stationed near him after his arrest and direct comments to an officer. Id. at 771-72. Peerson attempted to argue that his physical pain, depression, and medicated state, among other things, "were the functional equivalent of the interrogation found to be unconstitutional in Mincey." Id. at 773. We disagreed, reasoning that a necessary element in Mincey was the "officer's unrelenting interrogation which continued even after Mincey repeatedly asked the officer to stop the questioning and get him an attorney," whereas in Peerson, the officer posed no question to the defendant and there was no evidence that the officer "acted in any way or said anything that was reasonably likely to elicit an incriminating response." Id. at 773. As Peerson did not argue that the severity of his condition prohibited him from perceiving the nature of his acts and words, the court held that "while [his] emotional and physical state may affect the weight the jury attributes to the statements, those factors do not affect their admissibility." Id. at 774.

Here, the trial court's unchallenged findings of fact after the CrR 3.5 hearing included that York placed Petersen under arrest shortly after they arrived at the hospital.[5] Afterward, York advised Petersen of his constitutional rights, reading from his department-issued card. The court found that Petersen

---

[5] The record does not indicate the specific amount of time between York's arrival at the hospital and the arrest. Trooper York responded to the scene around 9 p.m., left the scene around 9:20 p.m., arrived at the hospital 20-25 minutes later, and testified that he went straight to Petersen once he arrived at the hospital. Once he was with Petersen, he determined he was showing the same indicators of intoxication as before, had probable cause, and arrested him.

expressed no confusion about his rights. He indicated he understood his rights and agreed to speak to York. York additionally indicated Petersen's acknowledgment of his rights on a pre-printed form.

After York left the hospital room, he told Gannon that he had advised Petersen of his Miranda rights. Gannon then spoke to Petersen within 15 minutes after York had read Petersen his Miranda rights. During that interaction, Gannon asked Petersen questions about his consumption of alcohol and the collision. Even if, unlike the officers in Peerson, York and Gannon both posed questions to Petersen, Petersen was not repeatedly questioned while "barely conscious," as was Mincey. The only indication of the severity of Petersen's injuries was the amount of time he spent in the hospital, which was around two hours. Given the brevity of the visit, Petersen's verbal acknowledgment of receiving and understanding the Miranda warnings and his agreement to speak to Gannon, the unchallenged facts support the trial court's conclusion that Petersen voluntarily, knowingly, and intelligently waived his rights before speaking to Gannon. Thus, the court did not err by admitting testimony about Petersen's statements to Gannon.

II.     Sufficiency of Evidence

The jury found Petersen guilty of vehicular homicide and found by special verdict two alternative means: he operated a motor vehicle (1) in a reckless manner and (2) with disregard for the safety of others. Petersen claims there was insufficient evidence of either alternative means. RCW 46.61.520. We disagree.

15

Due process requires that the State prove every element of a crime beyond a reasonable doubt. State v. Johnson, 188 Wn.2d 742, 750, 399 P.3d 507 (2017). Whether sufficient evidence supports a defendant's conviction is a question of law reviewed de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016) (citing State v. Berg, 181 Wn.2d 857, 867, 337 P.3d 310 (2014)). To determine whether sufficient evidence supports a conviction, an appellate court must "view the evidence in the light most favorable to the prosecution and determine whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt." State v. Homan, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). A claim of insufficient evidence admits the truth of the State's evidence and all reasonable inferences from that evidence. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All reasonable inferences must be interpreted in favor of the State and most strongly against the defendant. Id. at 201.

> Vehicular homicide may be proved in three alternative ways:
>
> (1) When the death of any person ensues within three years as a proximate result of injury proximately caused by the driving of any vehicle by any person, the driver is guilty of vehicular homicide if the driver was operating a motor vehicle:
> > (a) While under the influence of intoxicating liquor or any drug, as defined by RCW 46.61.502; or
> > (b) In a reckless manner; or
> > (c) With disregard for the safety of others.

RCW 46.61.520. The State charged Petersen with all three alternative means under subsections (1)(a), (b), and (c). The jury did not find that Petersen drove while under the influence, the first alternative means, so this is not an issue on appeal.

16

A. Operating a Motor Vehicle in a Reckless Manner

Driving "in a reckless manner" means "driving in a rash or heedless manner, indifferent to the consequences." State v. Roggenkamp, 153 Wn.2d 614, 618, 106 P.3d 196 (2005). Petersen contends "the defining actions of driving in a 'rash or heedless manner indifferent to the consequences' are largely lacking." He argues that his actions must have been "egregious, involving speeding or engaging in notably dangerous behavior" to satisfy the reckless standard, but without citing to authority. We disagree.

The State highlights several cases in which consuming alcohol was relevant to prove driving in a reckless manner. In State v. Fateley, the defendant appealed a negligent homicide conviction.[6] 18 Wn. App. 99, 103, 566 P.2d 959 (1977). The court found there was sufficient evidence to conclude the defendant drove his vehicle in a reckless manner based in part on the "more than sufficient evidence of intoxication." Id. Further, the court in Fateley noted that "[s]uch evidence has been considered relevant in proving negligent driving, State v. Birch, 183 Wn. 670, 49 P.2d 921 (1935), and in proving reckless driving, State v. Travis, 1 Wn. App. 971, 465 P.2d 209 (1970)." Fateley, 18 Wn. App. at 103 n.5.

---

[6] The negligent homicide statute at issue in Fateley contains the same language as the statute in this case:

> RCW 46.61.520 states:
> "Negligent homicide by motor vehicle—Penalty. (1) When the death of any person shall ensue within three years as a proximate result of injury received by the driving of any vehicle by any person while under the influence of or affected by intoxicating liquor or drugs, or by the operation of any vehicle in a reckless manner or with disregard for the safety of others, the person so operating such vehicle shall be guilty of negligent homicide by means of a motor vehicle."

18 Wn. App. at 100 n.2.

Similarly, in State v. Hill, the court affirmed defendant's conviction for vehicular assault where there was evidence she was intoxicated. 48 Wn. App. 344, 347-48, 739 P.2d 707 (1987). Hill argued that driving the wrong way on a freeway was only a traffic infraction, so she could be guilty only of negligence. Id. The court disagreed, reasoning that although the statute does not define "reckless manner," case law defines it as driving in a "heedless, careless or rash manner or in a manner showing indifference to the consequences." Id. at 348 (citing State v. Partridge, 47 Wn.2d 640, 645-46, 289 P.2d 702 (1955), and Fateley, 18 Wn. App. at 105-06). The court then concluded that the evidence satisfied this definition, as it showed Hill was driving the wrong way on the freeway, failed to attempt any avoidance of oncoming traffic, and was intoxicated. Hill, 48 Wn. App. at 348.

In this case, there was ample evidence that Petersen was intoxicated.[7] Petersen admitted he had consumed at least four shots of whiskey earlier in the day. York and Gannon testified they observed Petersen had bloodshot, watery eyes and a flushed face, which are indicators of intoxication. In addition, Petersen exhibited six out of six clues on the HGN test administered by Gannon, indicating he may have been impaired while driving.

Petersen also argues that neither Charleston's nor Trooper Beeler's testimony was sufficient to establish that he was speeding at the time of the

---

[7] While the jury did not find Petersen guilty of the first alternative means, vehicular homicide "while under the influence of intoxicating liquor or any drug," RCW 46.61.520(a), for purposes of analyzing a sufficiency challenge, the jury's finding does not guide our review on appeal. Instead, as noted above, we "view the evidence in the light most favorable to the prosecution and determine whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt." Homan, 181 Wn.2d at 105.

accident. Charleston estimated Petersen was speeding due to how quickly he caught up to Charleston's vehicle right before the accident. Beeler, an expert in accident reconstruction, opined that Petersen was traveling in excess of 55 miles per hour—the posted speed limit—though she could not verify exactly how fast Petersen was going. In addition, WSP Troopers Beeler and Morhous, both of whom had experience in collision reconstruction, testified that the damage to the car and motorcycle was associated with a "high-speed collision."

In addition to this testimony that Petersen drove at a high rate of speed, there was also evidence he passed several cars in a no-passing zone with an upcoming downhill turn. Petersen acknowledged he was familiar with this area of highway, which included a hill with a turn that required special care. Beeler and Morhous testified that Petersen traveled over the double-yellow center line into the wrong way of traffic, lost control, and collided with the motorcycle.

When viewed in the light most favorable to the State and most strongly against Petersen, any rational fact finder could have found beyond a reasonable doubt Petersen was driving in a rash or heedless manner, indifferent to consequences. Thus, the evidence was sufficient to prove vehicular homicide based on driving in a reckless manner.

B.  Vehicular Homicide – Disregard for Safety of Others

Petersen was also convicted of vehicle homicide under the alternative means of driving "with disregard for the safety of others." RCW 46.61.520(1)(c). RCW 46.61.520(1)(c) "implies an aggravated kind of negligence or carelessness, falling short of recklessness but constituting a more serious dereliction than the

hundreds of minor oversights and inadvertences encompassed within the term 'negligence.' " State v. Eike, 72 Wn.2d 760, 765-66, 435 P.2d 680 (1967). "Some evidence of a defendant's conscious disregard of the danger to others is necessary to support a charge of vehicular homicide." State v. Vreen, 99 Wn. App. 662, 672, 994 P.2d 905 (2000), aff'd, 143 Wn.2d 923, 26 P.3d 236 (2001), abrogated on other grounds by Rivera v. Illinois, 556 U.S. 148, 129 S. Ct. 1446, 173 L. Ed. 2d 320 (2009). Ordinary negligence cannot support a conviction for vehicular homicide. Eike, 72 Wn.2d at 765.

Cases affirming convictions for driving with disregard for the safety of others generally include evidence of egregious driving errors, such as travelling on the wrong side of the road. In Eike, the defendant was "driving at 45 to 50 miles per hour on a dark, wet, but well-marked highway, rounding a sweeping curve on the wrong side of the road at night, into a head on collision with an oncoming car." 72 Wn.2d at 766. In State v. Knowles, the defendant admitted to smoking marijuana and drinking beer before the accident, and he "drove into a blind curve, in the wrong lane, at a speed of at least 22 miles per hour over the posted cautionary speed." 46 Wn. App. 426, 431, 730 P.2d 738 (1986).

Petersen argues that while the evidence shows he was travelling fast, this evidence does not contradict his testimony that his vehicle entered into the opposite lane due to the vehicle in front of him suddenly braking and causing him to swerve to avoid hitting that vehicle. Petersen testified that attempting to take this evasive action caused the back part of his vehicle to slide into the oncoming

20

southbound lane—possibly due to wet conditions—which is where he collided with the motorcyclist.

Despite Petersen's testimony about a possible different cause for his swerving, with the evidence viewed in the light most favorable to the prosecution, we conclude any rational fact finder could have found beyond a reasonable doubt that Petersen operated his vehicle with disregard for the safety of others. "[T]he jury is permitted to consider all the circumstances leading" to Petersen's vehicle entering into the opposite lane of traffic and to determine whether either scenario amounted to aggravated negligence. State v. Imokawa, 4 Wn. App. 2d 545, 561, 422 P.3d 502 (2018), rev'd on other grounds, 194 Wn.2d 391, 450 P.3d 159 (2019) (finding there was sufficient evidence to prove the defendant operated his vehicle with disregard for the safety of others). As with the drivers in Eike and Knowles, there was evidence here that Petersen was driving at a high rate of speed as he approached a steep turn. Petersen acknowledged he was familiar with the road and knew that the hill and the turn required special care. It was undisputed that the sun was setting and it was getting dark. Further, counter to Petersen's own testimony, other evidence suggested Petersen drove intentionally in the oncoming lane of traffic in an attempt to pass other vehicles and that the conditions were dry. Taken in the light most favorable to the prosecution and admitting the State's evidence as true—with all reasonable inferences interpreted in favor of the State and most strongly against the defendant—we conclude there was sufficient evidence to support the vehicular homicide conviction.

21

III.     <u>Failure to Award Credit for Time Served on Electronic Home Monitoring</u>

Petersen argues the trial court erred when it denied his request for credit for time spent on voluntary electronic home monitoring (EHM) for approximately a year before his conviction. The State counters that because Petersen was convicted of a violent crime, Petersen is ineligible to receive credit for any time he was required to comply with an electronic monitoring program prior to sentencing.

Whether a defendant is entitled to credit for time served while on home monitoring is a question of law we review de novo. <u>See</u> <u>State v. Swiger</u>, 159 Wn.2d 224, 227, 149 P.3d 372 (2006). The State cites RCW 9.94A.734(1)(a), which states, "Home detention may not be imposed for offenders convicted of the following offenses . . . (a) A violent offense." However, the appropriateness of a *postconviction* confinement for a given crime "is a different issue . . . than whether the statute affords credit for a type of *presentence* restraint." <u>State v. Speaks</u>, 119 Wn.2d 204, 208, 829 P.2d 1096 (1992) (emphasis added).[8]

Neither party cites the applicable statute, RCW 9.94A.505(7)(a), which directly addresses credit for EHM during sentencing. This provision states, "The

---

[8] The Sentencing Reform Act of 1981 requires a sentencing court to credit a felony defendant's sentence for presentence time spent in "confinement." <u>State v. Shelley</u>, 19 Wn. App. 2d 451, 454-55, 496 P.3d 310 (2021). RCW 9.94A.505(6) provides, "The sentencing court shall give the offender credit for all confinement time served before the sentencing if that confinement was solely in regard to the offense for which the offender is being sentenced." "Confinement" includes "partial confinement," which includes work release, home detention, work crew, electronic monitoring, and a combination of work crew, electronic monitoring, and home detention. <u>Shelley</u>, 19 Wn. App. 2d at 455; RCW 9.94A.030(8), (35). Electronic monitoring is defined to require "tracking the location of an individual through the use of technology that is capable of determining or identifying the monitored individual's presence or absence at a particular location. . . . ." RCW 9.94A.030(24).

22

sentencing court shall not give the offender credit for any time the offender was required to comply with an electronic monitoring program prior to sentencing if the offender was convicted of one of the following offenses: (a) A violent offense; . . . ." Vehicular homicide in a reckless manner is a violent offense. RCW 46.61.520(1); 9.94A.030(58)(a)(xiv).

Because Petersen was convicted of a violent offense, the court properly declined to credit Petersen for time served while subject to EHM pretrial, as credit is proscribed by RCW 9.94A.505(7)(a).[9]

IV.     Ineffective Assistance of Counsel

Petersen contends in his SAG that he was deprived of his constitutional right to effective assistance of counsel in several ways: his attorney failed to investigate additional information provided by him, to disclose the State's discovery to him, to follow his requests as to how to present the evidence, and to inform him of the consequences for guilty verdicts or non-guilty pleas. The State did not respond to these claims. We conclude Petersen's SAG is insufficient under RAP 10.10(c) because it does not adequately inform the court of the nature and occurrence of the alleged errors.

---

[9] The record also indicates an alternative basis for not giving Petersen credit for qualifying EHM: his pretrial monitoring was limited to a secure continuous remote alcohol monitor (SCRAM), which is a transdermal alcohol sensing system, worn as an ankle bracelet, that samples a wearer's skin surface for ethanol vapor at specific intervals. See PAUL R. MARQUES & A. SCOTT MCKNIGHT, NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., EVALUATING TRANSDERMAL ALCOHOL MEASURING DEVICES 6-7 (2007). This style of monitoring does not qualify as EHM under RCW 9.94A.030(24), as it lacks global positioning system (GPS) tracking capabilities.

For a successful claim of ineffective assistance of counsel, a defendant must establish both objectively deficient performance and resulting prejudice. State v. Emery, 174 Wn.2d 741, 754-55, 278 P.3d 653 (2012). To show deficient performance, the defendant must show that counsel's representation fell below an objective standard of reasonableness in light of all the circumstances. Strickland v. Washington, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "Courts engage in a strong presumption counsel's representation was effective." State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Prejudice requires that "there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 334-35. The court need not consider both deficiency and prejudice if a petitioner fails to prove one. In re Pers. Restraint of Crace, 174 Wn.2d 835, 847, 280 P.3d 1102 (2012).

Petersen alleges a variety of missteps that revolve around a lack of communication between himself and his counsel, as well as a divergence in strategy concerning the presentation of Petersen's case. Petersen states that his counsel failed to "investigate, gather, and present . . . discovery presented to defense coun[sel] from [Petersen]," but neither cites to the record nor specifies what information he is referencing. Petersen also asserts the State's discovery was not disclosed to him, but he similarly does not reference the record or specify what information was not relayed to him.

In a SAG, "[r]eference to the record and citation to authorities are not necessary or required, but the appellate court will not consider a defendant's

statement of additional grounds for review if it does not inform the court of the nature and occurrence of alleged errors." RAP 10.10(c). "[T]he appellate court is not obligated to search the record in support of claims made in a defendant's statement of additional grounds for review." Id. Also, matters outside the record on direct appeal will not be considered; "[i]f a defendant wishes to raise issues on appeal that require evidence or facts not in the existing trial record, the appropriate means of doing so is through a personal restraint petition." McFarland, 127 Wn.2d at 335. Petersen's claims of ineffective assistance of counsel related to investigation and discovery do not meet the standard set in RAP 10.10(c).

Second, Petersen alludes to a difference in trial strategy concerning the presentation of the case and asserts this divergence "could have had [an] effect on [the] verdict from [the] jury." But again, Petersen did not provide details concerning the allegedly deficient trial strategy as required for this court to consider his claims under RAP 10.10(c).

Finally, Petersen asserts he was not made aware of the "possible outcome of [the] verdict for guilty or non guilty plea[s]." Because this claim requires evidence that is not in the existing trial record, we cannot consider it on appeal. See McFarland, 127 Wn.2d at 335. Due to these deficiencies, we do not consider Petersen's ineffective assistance of counsel claims.

CONCLUSION

We affirm Petersen's conviction for vehicular homicide and his sentence.

_Chung, J._

WE CONCUR:

_Birk, J._          _Smith, C.J._