# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 60070-6-II |
| Respondent, | |
| v. | |
| DEBORAH K. BLACKBURN, | UNPUBLISHED OPINION |
| Appellant. | |

Veljacic, A.C.J. — Deborah K. Blackburn was convicted of possession of methamphetamine and buprenorphine with intent to deliver. Blackburn raises several issues on appeal: (1) Blackburn argues that the trial court abused its discretion by requiring a defense witness to testify in jail clothing; (2) Blackburn argues that she was unlawfully seized under the Fourth Amendment to the United States Constitution and article 1, § 7 of the Washington State Constitution, and that the trial court's findings to the contrary were not supported by substantial evidence; (3) Blackburn argues that she was subjected to a custodial interrogation without being advised of her *Miranda*[1] rights in violation of the Fifth Amendment to the United States Constitution and article 1, § 9 of the Washington State Constitution, and she also argues that the court's findings to the contrary were not supported by substantial evidence; (4) Blackburn argues that there was insufficient evidence to support her conviction for possession of buprenorphine with

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

an intent to deliver; (5) Blackburn claims that the State engaged in prosecutorial misconduct by disregarding the trial court's motion in limine and eliciting testimony that Blackburn used methamphetamine as well as improper opinions regarding her guilt, and relatedly, Blackburn argues that the trial court unfairly enforced relevant motions in limine against defense counsel but did not do the same for the State; and (6) Blackburn asserts that cumulative error denied her the right to a fair trial.

We conclude that: (1) the trial court abused its discretion by requiring a defense witness to wear jail clothing when testifying at trial and the error was not harmless; (2) substantial evidence supports the trial court's findings that Blackburn was not unlawfully seized under the Fourth Amendment to the United States Constitution or article 1, § 7 of the Washington State Constitution; (3) substantial evidence supports the trial court's findings that Blackburn was not subjected to a custodial interrogation without being advised of her *Miranda* warnings in violation of the Fifth Amendment to the United States Constitution or article 1, § 9 of the Washington State Constitution; and (4) there was sufficient evidence to support Blackburn's conviction for possession of buprenorphine with intent to deliver.

Because we conclude that requiring a defense witness to wear prison clothing was not harmless, we do not address Blackburn's remaining arguments regarding prosecutorial misconduct or cumulative error. Accordingly, we affirm in part, reverse in part, and remand for a new trial.[2]

---

[2] In Blackburn's opening brief, she also argues that she received ineffective assistance of counsel and that the trial court abused its discretion in denying her Drug Offender Sentencing Alternative (DOSA) request. Blackburn withdrew these assignments of error in her reply brief.

FACTS

I.     BACKGROUND

Blackburn lived with her son, Landon Morse, in Aberdeen.  In 2023, Grays Harbor Police Department officers conducted several controlled buys with Morse through a confidential informant.  Several of the sales had taken place at Blackburn's home.  On October 25, officers arrested Morse for the sale of fentanyl.

II.    BLACKBURN'S ARREST

On October 26, around 2:30 p.m., seven uniformed officers, along with a narcotic detection dog, executed a search warrant at Blackburn's home.  Morse, not Blackburn, was the target of the search warrant.  The State acknowledged that at the time of executing the search warrant, the officers who conducted the search did not have probable cause to suspect Blackburn of committing a crime.

No force was used when entering Blackburn's home.  Blackburn and her friend, Aaron Bryan, were at the house when the officers arrived.  Sergeant Sexton instructed Blackburn and Bryan to sit down.  Blackburn was provided a copy of the search warrant and explained the reason for the search.  According to Detective Jarrod Figg, Blackburn and Bryan were informed that they were free to leave.  Bryan left shortly thereafter, but Blackburn wanted to stay at the house because "her granddaughter had a sporting event at [4:00 p.m.] that . . . she needed to get ready for."  Rep. of Proc. (RP) (Jan. 26, 2024) at 38.  Officers did not tell Blackburn that she could get ready for the event.

3

According to Blackburn, Figg told only Bryan that he was free to leave. It was later discovered that Figg's report did not explicitly mention that Blackburn was "advised in any way that she was free to leave."[3] RP (Jan. 26, 2024) at 54. Figg later acknowledged that it could have been possible that Blackburn "was not advised she was free to leave," but emphasized that it was a standard practice to give people such advisement when they were not a suspect. RP (Jan. 26, 2024) at 55-56.

After talking with Figg, Blackburn "sat on the couch for a little bit and then she asked if she could get ready for the event." RP (Jan. 26, 2024) at 38. Blackburn testified that she went to the bathroom and was followed by one of the officers. The officer wanted to look at a JBL speaker that was in the bathroom, and the officer also went "through the clothes that [Blackburn] was going to change into." RP (Jan. 26, 2024) at 96. Once officers had completed searching the bathroom and salon room,[4] Blackburn got ready for her event. During this period, Figg testified that officers did not monitor Blackburn and once the rooms were searched, she was left alone. In contrast, Blackburn said that she "was followed" and did not feel like she was free to leave at any point. RP (Jan. 26, 2024) at 92-93. Blackburn later testified,

> [T]here [were] so many officers around I just felt like when I would move around I felt like there [were] eyes on me and I was, like, being followed. I just—I just didn't feel like I was—it was pretty uncomfortable. I just didn't feel like I was free to leave or I would have left.

---

[3] Specifically, Figg's report stated, "[Blackburn] was advised of the reason we were [at her residence] and [she] complied with our requests. Blackburn was also provided with a copy of the search warrant. It should be noted, Aaron Bryan was also in the residence upon our arrival but was advised he was free to leave." Clerk's Papers (CP) at 123.

[4] Blackburn operated a hair salon from her home.

RP (Jan. 26, 2024) at 93. Blackburn, however, acknowledged that the officers did not "tell [her] that [she] had to let them know" what she was doing or where she was going. RP (Jan. 26, 2024) at 100.

At some point that afternoon, Blackburn "asked if she could go tend to her chickens" in the backyard. RP (Jan. 26, 2024) at 41. "[N]o one escorted" Blackburn outside. RP (Jan. 26, 2024) at 41. Blackburn was outside for approximately "half an hour by herself," and none of the officers monitored her during this period. RP (Jan. 26, 2024) at 41. While Blackburn was outside, Havoc, the narcotic detection dog, conducted a "sniff search of the residence to locate any illegal narcotics inside [Blackburn's] residence." RP (Jan. 26, 2024) at 42. Havoc alerted that there were illegal narcotics in a safe located in Blackburn's craft room.

Upon discovering the safe, Figg went outside and asked Blackburn if he "could have the combination to the safe." RP (Jan. 26, 2024) at 45. Blackburn "was [outside] trying to catch a chicken" and "cleaning the patio." RP (Jan. 26, 2024) at 51. Figg later testified that he was not "100 percent [on] how [he] phrased" the request, but he did not "demand that [Blackburn] come inside and open" the safe. RP (Jan. 26, 2024) at 46. Blackburn testified that Figg told her that she had to open the safe.

Instead of providing the combination, Blackburn went inside to open the safe herself. Officer Ryan Tully and two other officers were in the craft room when Blackburn went upstairs to open the safe. Before opening the safe, Tully asked Blackburn who had access to the safe. In response, Blackburn explained that she was the only person who had access to the safe. Blackburn stated that Morse "sometimes would put items in [the safe], but [Morse] *did not have a code and did not actually have access to the safe*." RP (Jan. 26, 2024) at 82 (emphasis added). Officers

5

later testified that Blackburn would have been free to leave up to the point that they discovered the contents of the safe.

After Blackburn opened the safe, she sat on a couch in the craft room. According to Tully, Blackburn "requested to stay in the room during the search." RP (Feb. 7, 2024) at 142. Two officers were at the door to the craft room, and another officer was searching the safe. Officers found "28.2 grams of suspected methamphetamine, [approximately 1,000] Suboxone strips in prescription bottles with the labels removed, three digital scales, five suspected Fentanyl pills, $12,187 in cash, packaging materials," a Charter Arms .357 revolver, and a Browning 12 GA shotgun. Clerk's Papers (CP) at 3. Blackburn later testified that she felt like she was under arrest *after* the safe had been opened.[5]

Officers arrested Blackburn after discovering the contents of the safe and she was then advised of her *Miranda* rights. Blackburn did not make any statements after being arrested. Blackburn was charged with possession with intent to deliver methamphetamine as well as possession with intent to deliver buprenorphine. Both counts had firearm enhancements.

---

[5] The exact exchange at the suppression hearing is as follows:

> [STATE:] . . . So tell me, again, what specific action did the police take during the execution of this search warrant that was tantamount to you feeling like you were under arrest?
> [BLACKBURN:] When I was in the craft room, I was sitting on the couch and I had several officers around me. I felt like I couldn't get through them. I had two at the door. I didn't feel like I was going to get up and walk out. That was—
> [STATE:] Was that after the safe was already opened?
> [BLACKBURN:] That was after the safe was already opened.

RP (Jan. 26, 2024) at 100-01.

III.    PRETRIAL PROCEEDINGS

A.    Blackburn's Motion to Suppress

Blackburn moved to suppress her statements regarding who had access to the safe as well at its contents under CrR 3.5 and 3.6.  Blackburn argued that she was unlawfully seized under the Fourth Amendment to the United States Constitution and article 1, § 7 of the Washington State Constitution.  Blackburn also argued that she was subjected to a custodial interrogation without being advised of her *Miranda* rights in violation of the Fifth Amendment to the United States Constitution and article 1, § 9 of the Washington State Constitution.  After hearing testimony from several witnesses, including Blackburn, the trial court denied Blackburn's motion.  The court concluded that Blackburn was not "'in custody' at any point prior to her arrest."  2 RP (Jan. 26, 2024) at 102-05.  Specifically, the court found that

> [d]uring the time that [the Grays Harbor Drug Task Force (DTF)] and other law enforcement officers searched [Blackburn's] house, [Blackburn moved] freely about her home, even going outside to feed her chickens.  At no point before the law enforcement officers placed [Blackburn] in handcuffs would a reasonable person believe they were in custody.

CP at 17.

B.    Morse Testifying at Trial

Prior to trial, the court addressed the parties' motions in limine.  Blackburn intended to have Morse testify in support of her case, but an issue arose regarding Morse's testimony.  Because of Morse's related pending charges, both the State and the court expressed concern about Morse testifying.

7

The State also brought Morse's appearance at trial to the court's attention. Because Morse was in custody, the State raised the question of whether Morse would wear civilian clothes or his prison clothing. Defense counsel joined in raising the issue to the court. The colloquy between the court and the parties is as follows:

> [STATE]: I have one additional concern about Mr. Morse's testimony. He is in custody currently. I have never had a witness on the stand who is in custody on another matter. I know if he were a defendant, he could be entitled to have civilian clothes. I have no idea how this works when they are a witness.
>
> [DEFENSE COUNSEL]: That's a good question, honestly, Your Honor.
>
> THE COURT: I will tell you how it works. [Morse] comes in in his jail scrubs. He is not—he is a witness. He is not a party. He is not the defendant. He is a nobody. He is a witness, and witnesses come as they are. If you had a witness among the unsheltered population and they were wearing holey underwear and nothing else, you would put him on the witness stand. He would be in here, right? You are not going to buy him clothes. That's the way it is. So you get what you pay for, . . . when you have a witness that's in jail scrubs, is in jail, you hitch a wagon to a witness at your own risk. So that's what we are doing.
>
> [STATE]: Good point. Just wanted to raise it just in case.
>
> THE COURT: I understand. Anything else?
>
> [DEFENSE COUNSEL]: No, Your Honor. That's all from me.

RP (Feb. 7, 2024) at 45-46.

IV.    TRIAL

At trial, the State called several officers in support of its case. 3 RP (Feb. 7, 2024) at 86, 118, 131. In several instances, the State elicited testimony that went into *why* the officers arrested Blackburn rather than simply recounting the facts. One example included:

> [STATE:] Why did you make the determination to arrest [Blackburn]?
>
> [OFFICER FIGG] With the—I guess there is just the totality—
>
> [DEFENSE COUNSEL:] Objection, calls for the conclusion of guilt.
>
> THE COURT[:] I am concerned about that, Counsel. I don't know what the answer is, but it should not be a conclusory, improper opinion. So tread carefully. Proceed.
>
> [STATE:] Again, why did you decide to do that?
>
> [OFFICER FIGG:] With the—with the—the meth[amphetamine] that we found, and the Suboxone strips, along with the money, the amount of money we found, it shows that in our—it was just more than just a user would have.

8

> [DEFENSE COUNSEL:] Objection; he is drawing conclusions from the evidence.
>
> [STATE:] I was just going to say, is that consistent with your training and experience that you mentioned earlier?
>
> [OFFICER FIGG:] Yes.
>
> THE COURT[:] The jury may receive the fact testimony with regards to the items that were found and those being the reason for the arrest. The jury will disregard the conclusory statement about it not being for personal use and being for dealing. The jury will disregard that testimony. Thank you.

RP (Feb. 7, 2024) at 105-06.

In another instance, when Tully was testifying, this exchange took place:

> [STATE:] . . . [H]ow many times have you investigated dealing or possession with intent to deliver methamphetamine or Suboxone?
>
> [TULLY:] I would say hundreds; over a hundred times.
>
> [STATE:] Okay. What were different about these two types of investigations?
>
> [TULLY:] Excuse me, difference between simple possession and delivery?
>
> [STATE:] Not in a legal sense, what factually happened in these that differentiated from the two?
>
> [DEFENSE COUNSEL:] Objection. [The State] is calling on the witness to interpret the evidence.
>
> THE COURT[:] Sustained. . . . [T]hat line of questioning is now over. Please proceed to your next line of questioning. Stick to the facts. Thank you very much.
>
> [STATE:] I have one more question, Your Honor. What is it that distinguishes you recommending a charge of intent to deliver versus possession?
>
> THE COURT: Same result.

RP (Feb. 7, 2024) at 137-38.

When examining Tully about the amount of Suboxone strips recovered from Blackburn's residence, this exchange took place:

> [STATE:] Is this the typical amount for a Suboxone user?
>
> [TULLY:] No, normally—
>
> [DEFENSE COUNSEL:] Relevance.
>
> [STATE:] Differentiating the intent to deliver from deliver, Your Honor.
>
> THE COURT: That invades the province of the jury. That is a legal conclusion for the trier [of] fact, not for the witness. Sustained. Next question.

RP (Feb. 7, 2024) at 155.

9

The State later asked Tully why he seized the bags of methamphetamine, suboxone strips, the "[$]12,000 in cash . . . , two firearms, the scales, [and] packaging materials." RP (Feb. 7, 2024) at 170. This drew another objection from defense counsel. The court overruled the objection, and Tully said, "Based on my training and experience[,] all those items combined together [was] indicative of sales. So, that's why I collected all of those items together." RP (Feb. 7, 2024) at 171. Defense counsel objected again, and the court commented, "[t]he witness' answer stands, except the last portion where he says it's indicative of sales. Again, that invades the province of the jury. It's for the jury to interpret the evidence that's admitted, decide whether or not it's evidence of intent to deliver. Witnesses can't answer those questions. Sustained. The next question." RP (Feb. 7, 2024) at 171.

Even after this exchange, the State again asked Tully to reflect on prior investigations and how it compared to the present case. The State asked, "So in previous investigations that resulted in a conviction, have you found these types of items specifically." RP (Feb. 7, 2024) at 171. Defense counsel again objected saying, "Your Honor, [the State] is eliciting the same thing." RP (Feb. 7, 2024) at 171. The court again sustained the objection.

Unlike the bags of methamphetamine, the State did not have an expert identify the alleged buprenorphine that was recovered from Blackburn's residence. Instead, the State relied on the testimony from Tully to identify the controlled substance. The State introduced images captured at Blackburn's house that showed containers labeled "Suboxone (*buprenorphine* and naloxone) sublingual film." CP at 132, 134 (emphasis added). The images are as follows:



CP at 132-33 (Ex. 12).



CP at 134-35 (Ex. 18).

When asking Tully about his familiarity with Suboxone, Tully testified that he had "come across Suboxone being sold illicitly" throughout his "years of experience in these types of investigations." RP (Feb. 7, 2024) at 188-89. Tully explained that Suboxone "is a little strip that

you place on the tongue." RP (Feb. 7, 2024) at 176. Tully also commented that it was common for people to get a prescription of Suboxone and "instead of taking the Suboxone for addiction, they [would] sell the Suboxone to people to use it . . . in between their fix of opiates . . . to not get sick and go through withdrawals." RP (Feb. 7, 2024) at 189.

The State proceeded to ask Tully how he knew that the substance retrieved from Blackburn's home was buprenorphine. Tully replied, "I can see the label on them. They are clearly marked as Suboxone buprenorphine sublingual film." RP (Feb. 7, 2024) at 152. Tully also noted that some of the "strips had not been opened or the packaging had not been opened on them." RP (Feb. 7, 2024) at 177. And while some of the strips "looked like they were more wrinkled, like they [had] been . . . in a wallet or something like that," there were Suboxone strips "in the bottles [that] appeared new." RP (Feb. 7, 2024) at 178. Tully commented that he had "never seen it possible to lawfully possess that amount of Suboxone" when reflecting on the amount of Suboxone recovered from Blackburn's home. RP (Feb. 7, 2024) at 180.

After the State rested its case, Blackburn called Morse to testify. Defense counsel had assured the court that Morse was willing to testify at the beginning of Blackburn's trial. Before taking the stand, however, Morse expressed that he did not want to testify. Outside the presence of the jury, the court engaged in a colloquy with the parties about the scope of Morse's testimony that would not infringe on his Fifth Amendment right against self-incrimination. The court limited Morse's testimony "to two lines of inquiry." RP (Feb. 7, 2024) at 283. The lines of questioning that the parties could pursue included:

> [(1) W]hat Ms. Blackburn does for a living, to the best of [Morse's] knowledge, and [(2)] whether or not, based on [Morse] being in the house and sharing the house with her, to the best of his knowledge, does he have any knowledge, information, to believe that his mother, Ms. Blackburn, is dealing drugs.

12

RP (Feb. 7, 2024) at 283. The court made clear that the restriction on Morse's testimony applied equally to defense counsel and the State.

On direct examination, defense counsel asked Morse if he knew what Blackburn did for a living. Morse replied that "[s]he is a hairdresser," and that Blackburn has been cutting and styling hair for "over 30 years." RP (Feb. 7, 2024) at 286. Morse commented that Blackburn had "a steady clientele" and she was "busy on a daily basis." RP (Feb. 7, 2024) at 286. Morse also stated that Blackburn charged a "[c]ouple hundred bucks . . . for a cut and style," and she took payments in the form of cash. RP (Feb. 7, 2024) at 286.

After discussing the details of Blackburn's hair salon business, defense counsel inquired if she had "any other sources of income." RP (Feb. 7, 2024) at 287. Specifically, defense counsel asked Morse if Blackburn had rented rooms in the "last couple of years . . . and she received rent money for that." RP (Feb. 7, 2024) at 287. Morse testified that he was unsure, but he knew that Blackburn had roommates. Then, the court cut off this line of questioning saying, "You are out of road, [counsel]. . . . You are done." RP (Feb. 7, 2024) at 287-88.

On cross-examination, the State asked Morse several questions about a prior interview Morse had given. The State asked Morse whether he had previously been "asked that [officers] found some drugs and money taken from" the safe at Blackburn's home. RP (Feb. 7, 2024) at 290. Defense counsel objected to this question on the basis that it was outside the scope of the court's order. The court sustained the objection, noting that the question was "also potentially incriminating" for Morse. RP (Feb. 7, 2024) at 291. The State argued that the question was "[i]mpeachment material," but the court emphasized that there were still Fifth Amendment concerns. RP (Feb. 7, 2024) at 291.

But the State persisted down this line of questioning. Reading directly from the interview transcript, the State quoted, "So it looks like there was some drugs and money taken from [Blackburn's] safe. Do you [(Morse)] know who the money and drugs would have belonged to?" RP (Feb. 7, 2024) at 291. Defense counsel objected to this question, but the court overruled the objection. Morse responded,

> I don't know. I don't know. I don't know who the drugs and money belongs to. I don't know. It's not—that's not my—that's not my dwelling. I don't know. You are asking me a question that I have no idea. I don't know what [the officers] found. I don't know anything about it.

RP (Feb. 7, 2024) at 292.

Eventually, Morse acknowledged that he had previously said that the drugs probably belonged to Blackburn. This led the State to ask, "So did you talk to the interviewer about your mother's drug of choice." RP (Feb. 7, 2024) at 293. Defense counsel objected again on the basis that the question was outside the scope of the court's order, but the court overruled the objection. Morse confirmed that he was asked that question and responded that he thought Blackburn's "drug of choice" was "[m]eth" and "Suboxone." RP (Feb. 7, 2024) at 294. The State summarized Morse's testimony by saying, "So again, isn't it true that when I asked about your mother's drug of choice, you said, yes, I think she uses Suboxone and meth. I think she was also using pills there for a while, but I don't know if she does anymore?" RP (Feb. 7, 2024) at 294. Again, defense counsel objected, and the court overruled the objection. Morse confirmed that was his answer.

Blackburn was ultimately found guilty of both counts. The jury did not, however, return an affirmative special verdict finding for either firearm enhancement.

Blackburn appeals her convictions.

ANALYSIS

I.      REQUIRING A DEFENSE WITNESS TO WEAR PRISON CLOTHING

Blackburn argues that the court abused its discretion by requiring Morse to testify in prison clothing and that the error was not harmless. Because the trial court declined to engage in any analysis on the issue, and the State does not demonstrate that the error was harmless, we agree with Blackburn.

A trial court's decision to require a witness to testify in jail clothing is reviewed for an abuse of discretion. *See State v. Jackson*, 195 Wn.2d 841, 850, 467 P.3d 97 (2020) (explaining that a trial court's decision to require a criminal defendant to wear restraints at trial is reviewed for an abuse of discretion). "A trial court abuses its discretion when its 'decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons.'" *Id.* (internal quotation marks omitted) (quoting *State v. Turner*, 143 Wn.2d 715, 724, 23 P.3d 499 (2001)). If a court abused its discretion by requiring a witness to testify in jail clothing, we review an alleged constitutional violation under the constitutional harmless error standard. *See Jackson*, 195 Wn.2d at 856. Under this standard, a constitutional error is "presumed to be prejudicial and the State bears the burden of proving that the error was harmless." *State v. Watt*, 160 Wn.2d 626, 635, 160 P.3d 640 (2007).

A criminal defendant has a right to a fair trial. *Estelle v. Williams*, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976). "The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Id.*

In *Estelle*, the United States Supreme Court acknowledged the prejudicial effect wearing prison clothes can have on a criminal defendant. *Id.* at 504-05. The Court explained "that the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may

15

affect a juror's judgment." *Id.* Similarly, requiring a defendant to wear restraints has been "viewed with disfavor because they may abridge important constitutional rights, including the presumption of innocence." *State v. Hartzog*, 96 Wn.2d 383, 398, 635 P.2d 694 (1981).

Courts have reached a similar conclusion for witnesses. In *Hartzog*, for example, our Supreme Court acknowledged that while there might be different interests at issue, "there may be some inherent prejudice to [the] defendant [by requiring a witness to wear restraints], as the jury may doubt the witness' credibility." *Id.* at 399. Similarly, in *State v. Rodriguez*, our Supreme Court recognized the potential prejudice a defendant may face when a testifying witness appears in restraints. 146 Wn.2d 260, 263-64, 45 P.3d 541 (2002). The court concluded that "an inmate witness, whether testifying for the defense or the state, should not appear before a jury in restraints absent a finding of necessity by the trial court." *Id.* at 269. The court reasoned that "[t]o fully protect the defendant against being convicted by impermissible factors rather than solely by the evidence, the rule against physical restraint, without a showing of necessity, must apply to all inmate witnesses." *Id.* at 268. The court made clear that "the responsibility for requesting a hearing" on the issue of restraints "*rests with* [*both of*] the parties." *Id.* at 269.

The court in *Rodriguez* also addressed the issue of prison clothing. *Id.* The court commented,

> Although potential harm to a defense witness's credibility has been accepted as a reason for extending the rule against physical restraint to defense witnesses, that rule has its basis in protecting the defendant's right to a fair trial. *There is no dispute that prison garb,* [restraints,] *and handcuffs have effects on a jury that are hard to quantify*.

*Id.* at 266 (emphasis added). And when addressing the facts of the case, the court explained, "The witness. . ., *while clad in clothing clearly denoting guilt and his status as a prisoner*, testified to a criminal association with the defendant. This associated guilt and prisoner status had the potential

16

to prejudice the presumption of innocence to which the defendant was entitled." *Id.* (emphasis added).

Ultimately, our Supreme Court affirmed Rodriguez's conviction. *Id.* at 272. The court reasoned that Rodriguez "failed to carry his burden of demonstrating that a new trial was" necessary because had Rodriguez raised a timely objection, "the [trial] court would have had an opportunity to weigh the considerations involved." *Id.* at 271-72. In that case, "neither the State nor . . . Rodriguez requested a hearing" on the issue of restraints or prison clothing for the State's witness. *Id.* at 269. And Rodriguez did not object to the witness's "appearance in [restraints], nor did he request a curative instruction to the jury." *Id.* Instead, Rodriguez moved for a mistrial, which the trial court denied. *Id.*

At the outset, the State argues that, like *Rodriguez*, we should affirm Blackburn's conviction because she did not object to Morse wearing prison clothing, nor did she request a curative instruction. The trial court's comments in this case, however, require a different result. After the State raised the issue of Morse testifying in prison clothing, *defense counsel joined in the State's inquiry* saying, "That's a good question, honestly, Your Honor." RP (Feb. 7, 2024) at 45. In response, the trial court remarked,

> I will tell you how it works. [Morse] comes in his jail scrubs. He is not—he is a witness. He is not a party. He is not the defendant. He is nobody. He is a witness, and witnesses come as they are. If you had a witness among the unsheltered population and they were wearing holey underwear and nothing else, you would put him on the witness stand. He would be in here, right? You are not going to buy him clothes. That's the way it is. So you get what you pay for, . . . when you have a witness that's in jail scrubs, is in jail, you hitch a wagon to a witness at your own risk. So that's what we are doing.

RP (Feb. 7, 2024) at 45.

This case is *remarkably* different from *Rodriguez*. There, the trial court never had the opportunity to address the issue of restraints and prison clothing prior to the motion for a mistrial

17

because neither party raised it. 146 Wn.2d at 270-72. Here, the State brought this issue to the court's attention prior to trial, which was joined by defense counsel. The comments from both parties would have been sufficient under *Rodriguez*, especially since the issue was prison clothing, not restraints. *See Estelle*, 425 U.S. at 505 ("Unlike physical restraints, . . . compelling an accused to wear jail clothing furthers no essential state policy."); *Jackson*, 195 Wn.2d at 852-55 (holding that a trial court must engage in an individualized inquiry and consider several factors to determine whether a defendant should be restrained). Upon either party raising this issue, the trial court should have engaged in a balancing test to determine whether Morse had to testify in prison clothing at trial. That is not what happened here. Instead, the trial court summarily denied any opportunity to discuss the issue. Refusal to exercise its discretion constituted an abuse of discretion and constitutional error. *Jackson*, 195 Wn.2d at 854-55.

In *Rodriguez*, the court placed the burden on the defendant to demonstrate the necessity for a new trial. 146 Wn.2d at 267. This is a result of the procedural posture of the case, which turned on the denial of a motion for a mistrial. *Id.* at 269-71. But in *Jackson*, the trial court engaged in a "consolidated motion hearing" and the defendant was ultimately "fitted with a leg brace for trial." 195 Wn.2d at 846-47. Our Supreme Court concluded that the burden was on the State to prove that the constitutional error was harmless. *Id.* at 856. *Jackson* is more applicable to the case before us.

Because we conclude that requiring Morse to wear prison clothing amounted to constitutional error, the State must establish that the error was harmless beyond a reasonable doubt. *Id.* at 856. Blackburn argues that she was prejudiced because Morse "appear[ed] less credible," and her "presumption of innocence [was] impugned by her association with a witness 'clad in

18

clothing clearly denoting guilt and his status as a prisoner.'" Br. of Appellant at 31-32 (quoting *Rodriguez*, 146 Wn.2d at 267).

The State did not address the potential prejudice Blackburn faced by Morse testifying in prison clothing in its brief. Nor did the State argue against any prejudice at oral argument. In fact, the State acknowledged that Blackburn *could have been prejudiced* by Morse wearing prison clothing.[6] Because we presume prejudice, *Watt*, 160 Wn.2d at 635, and the State made no effort to argue that the error was harmless beyond a reasonable doubt, the State fails to meet its burden.

Therefore, we conclude that the error was not harmless, and Blackburn is entitled to a new trial.[7]

---

[6] At oral argument, the State repeatedly argued that defense counsel did not object to Morse being required to wear prison clothing at trial for strategic reasons. But the State also acknowledged that by defense counsel joining the State in raising the issue to the trial court, it did not appear that having Morse testify in prison clothing was a strategy defense counsel sought to employ.

[7] After briefing closed on this case, our supreme court clarified the constitutional harmless error test. Applying that test, a court considers "(1) the corrosive impact of the constitutional error . . ., including its impact on how the fact finder might consider . . . the properly admitted evidence, as well as (2) the strength of the properly admitted evidence of guilt." *State v. Magana-Arevalo*, ___ Wn.3d ___, 582 P.3d 330, 334 (2026).
As explained in *Rodriguez*, prison clothing, which "clearly denot[es] guilt and [a person's] status as a prisoner, . . . [has] the potential to prejudice the presumption of innocence to which [a] defendant [is] entitled." 146 Wn.2d at 267. Again, here, the State did not address prejudice to Blackburn flowing from Morse being required to appear in jail clothing. We conclude that the corrosive impact of this was not harmless beyond a reasonable doubt because it could have negatively impacted how the fact finder might consider all evidence in the trial, to the prejudice of Blackburn.

II.     ADMISSIBILITY OF PRE-ARREST STATEMENTS[8]

 A. Seizure

Blackburn argues that the court's finding of fact 2,[9] where it concluded that Blackburn was never in custody during the execution of the search warrant, is not supported by substantial evidence. Consequently, Blackburn alleges that she was unlawfully seized under the Fourth Amendment to the United States Constitution and article 1, § 7 of the Washington State Constitution. We disagree.

"Whether police have seized a person is a mixed question of law and fact." *State v. Taylor*, 29 Wn. App. 2d 319, 328, 541 P.3d 1061, *review denied*, 3 Wn.3d 1003 (2024). A trial court's findings of fact are reviewed for substantial evidence. *Id.* "Substantial evidence is evidence enough to persuade a fair-minded person of the truth of the stated premise." *Id.* Because a "trial court is tasked with resolving issues of credibility and weighing evidence, . . . we give great deference to its factual findings." *Id.* But "[t]he ultimate determination of whether those facts constitute a seizure is [a question of law] . . . reviewed de novo." *Id.*

---

[8] Requiring Morse to wear prison clothing is dispositive of the appeal. But Blackburn also challenges the sufficiency of the evidence for her conviction of unlawful possession of buprenorphine with intent to deliver, and we must address that claim. *See State v. Rogers*, 146 Wn.2d 55, 58-62, 43 P.3d 1 (2002) (holding that the court of appeals erred in not addressing the defendant's sufficiency of the evidence argument even though it reversed on an alternative basis). Because we must evaluate the evidence in the record regarding Blackburn's conviction, we must also address the seizure and *Miranda* issues to determine if the challenged evidence and/or statements were admissible at trial and can form the evidence considered when determining sufficiency.

[9] In finding of fact 2, the trial court specifically found that, "During the entire time that DTF and other law enforcement officers searched [Blackburn's] house, [Blackburn moved] freely about her home, even going outside to feed her chickens. At no point before the law enforcement officers placed [Blackburn] in handcuffs would a reasonable person believe they were in custody." CP at 17.

The Fourth Amendment to the Constitution protects individuals against unreasonable searches and seizures. Similarly, the Washington State constitution provides, "No person shall be disturbed in [their] private affairs, or [their] home invaded, without authority of law." WASH. CONST. art. I, § 7. "'It is well settled that article I, section 7 of the Washington Constitution provides greater protection to individual privacy rights than the Fourth Amendment to the United States Constitution.'" *State v. Rankin*, 151 Wn.2d 689, 694, 92 P.3d 202 (2004) (quoting *State v. Jones*, 146 Wn.2d 328, 332, 45 P.3d 1062 (2002)).

A defendant challenging the admissibility of evidence under CrR 3.6 has the burden of demonstrating that the search and/or seizure was unlawful. *State v. Sum*, 199 Wn.2d 627, 636, 511 P.3d 92 (2022). If a defendant succeeds in meeting this burden, evidence derived of the unlawful seizure is "inadmissible as fruits of the poisonous tree." *State v. Kennedy*, 107 Wn.2d 1, 4, 726 P.2d 445 (1986).

"'[A] seizure occurs, under article I, section 7, when considering all the circumstances, an individual's freedom of movement is restrained and the individual would not believe [they are] free to leave or decline a request due to an officer's use of force or display of authority.'" *Sum*, 199 Wn.2d at 636 (alterations in original) (quoting *Rankin*, 151 Wn.2d at 695). Whether a seizure has occurred is determined by objectively looking at the actions of law enforcement; the subjective intent of the law enforcement officers is irrelevant unless that intent was communicated to the defendant. *Sum*, 199 Wn.2d at 636.

At the outset, both parties agree that officers lacked reasonable suspicion to detain Blackburn *at the beginning of the search* of Blackburn's residence. But the State maintains that Blackburn was free to leave up until the safe was opened.

21

Even though there is conflicting testimony on whether Blackburn was advised that she was free to leave at the beginning of the search, the court's findings are supported by substantial evidence. Figg testified it was standard practice to advise people not subject to the search warrant that they were free to leave. And Figg initially testified that Blackburn was advised that she was free to leave. Figg did acknowledge that it was possible that Blackburn "was not advised she was free to leave." RP (Jan. 26, 2024) at 55. But after this exchange occurred, Blackburn made clear that she wanted to stay at her house so she could get ready for her granddaughter's sporting event. It does not follow that the officers would have allowed Blackburn to get ready for the event and subsequently leave the residence had Figg originally informed Blackburn that she was not free to leave.

Ultimately, the trial court determined that Figg's testimony was more credible than Blackburn. 2 RP (Jan. 26, 2024) at 102 ("I do not believe based on the evidence that's been testified to here today that [Blackburn] was at any point under arrest until [the officers] actually had the [probable cause] to arrest [Blackburn]."). Because the trial court is tasked with issues of credibility, we defer to its judgment on this matter. *Taylor*, 29 Wn. App. 2d at 328 (explaining that an appellate court "give[s] great deference to [a trial court's] factual findings").[10]

Under the totality of the circumstances, an objective person would have believed that they were free to leave. After Blackburn's initial encounter with Figg, Blackburn was largely free to

---

[10] At oral argument, Blackburn, for the first time in this appeal, argued that because the trial court did not make a finding of fact that Blackburn was explicitly advised that she was free to leave, we must construe the absence of such finding against the State under *State v. Armenta*, 134 Wn.2d 1, 14, 948 P.2d 1208 (1997). Blackburn did not cite to *Armenta* in either brief, nor did she argue anything similar while relying on other authorities. Oral argument is too late to raise an argument, and we will not consider it. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (explaining that failure to provide sufficient argument in an opening brief waives the issue); RAP 10.3(a), (c).

go about her business and prepare for her granddaughter's sporting event. Blackburn was even left outside unattended for about half an hour. Blackburn maintains that she was "'followed' [by the officers] and had to 'let them know where [she] was going.'" Br. of Appellant at 16 (quoting RP (Jan. 26, 2024) at 92-93). But Blackburn later testified that the officers never told her that she had to let them know what she was doing or where she was going. And Figg testified that officers did not monitor Blackburn and she was left alone after they had searched the rooms upstairs. Most importantly, Blackburn acknowledged that she did not feel she was under arrest until *after* she opened the safe.

Therefore, we conclude that Blackburn was not unlawfully seized.

B.      Custodial Interrogation

Blackburn argues that the court's finding of fact 2 is not supported by substantial evidence. To that end, Blackburn asserts that she was subjected to a custodial interrogation without being advised of her *Miranda* rights in violation of the Fifth Amendment to the United States Constitution and article 1, § 9 of the Washington State Constitution. We disagree.

Under CrR 3.5, the trial court must conduct a hearing before admitting a defendant's statement into evidence. The purpose of a CrR 3.5 hearing is to prevent "the admission of involuntary, incriminating statements." *State v. Williams*, 137 Wn.2d 746, 751, 975 P.2d 963 (1999) (emphasis omitted). "We review challenged findings of fact entered after a CrR 3.5 hearing for substantial evidence and review de novo whether the trial court's conclusions of law are supported by its findings of fact." *State v. Rosas-Miranda*, 176 Wn. App. 773, 779, 309 P.3d 728 (2013).

The Fifth Amendment to the United States Constitution and article I, section 9 of the Washington Constitution both guarantee a defendant's "right to be free from self-incrimination."

*State v. Pinson*, 183 Wn. App. 411, 417, 333 P.3d 528 (2014). *Miranda* requires that before subjecting a person to custodial interrogation, law enforcement officers are required to inform the person of the right to remain silent and the right to an attorney. *State v. Escalante*, 195 Wn.2d 526, 532, 461 P.3d 1183 (2020). If a person is not informed of their *Miranda* rights, the person's statements made during a custodial interrogation, absent waiver, are inadmissible. *Id.*

A person is in custody when their freedom of action has been reduced in such a way as to resemble a formal arrest. *Id.* at 533. Significantly, our Supreme Court has noted that "even if a person is 'seized' within the meaning of the Fourth Amendment—such that a reasonable person in their position would not feel free to leave or otherwise terminate the encounter with law enforcement—they are not necessarily in 'custody' for *Miranda* purposes." *Id.* "Custody" refers to "'circumstances that are thought generally to present a serious danger of coercion.'" *Id.* (quoting *Howes v. Fields*, 565 U.S. 499, 508-09, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012)).

The relevant inquiry for determining when a person is in custody is "an objective one that asks how a reasonable person in the suspect's position would have understood the circumstances." *Escalante*, 195 Wn.2d at 533.

> To determine whether a reasonable person in the suspect's position would feel restrained to the degree associated with formal arrest, a court examines the totality of the circumstances. Relevant circumstances may include the nature of the surroundings, the extent of police control over the surroundings, the degree of physical restraint placed on the suspect, and the duration and character of the questioning.

*Id.* at 533-34.

Interrogation by law enforcement includes express questioning, "'but also . . . any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.'" *State v. Butler*, 34 Wn.

App. 2d 614, 621, 570 P.3d 383 (internal quotation marks omitted) (quoting *State v. Sargent*, 111 Wn.2d 641, 650, 762 P.2d 1127 (1988)), *review denied*, 5 Wn.3d 1021 (2025).

Here, the trial court's finding that Blackburn was not in custody is supported by substantial evidence. And when viewing the facts under the totality of circumstances, Blackburn was not in custody for the purposes of a custodial interrogation. All relevant statements and actions occurred *before* Blackburn opened the safe. As previously discussed, prior to opening the safe, Blackburn was largely able to go about her "daily responsibilities" and prepare for her granddaughter's sporting event. RP (Jan. 26, 2024) at 100. Blackburn was limited to some degree as officers were conducting an investigation of her home, but they did not monitor her or require her to inform them of where she was going or what she was doing. And it was not until Blackburn opened the safe that she truly felt like she was under arrest, which is when officers suspected Blackburn of committing a crime. It is relevant to our consideration that seven uniformed officers who were armed conducted the search at Blackburn's home. *Escalante*, 195 Wn.2d at 533-34. But again, the remaining facts support that Blackburn was not in custody until she opened the safe.

Blackburn relies on *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), to support her argument that she was in custody. Though federal circuit cases are merely persuasive, we discuss this case because the facts in *Craighead* are a good contrast to Blackburn's situation. In *Craighead*, "[e]ight law enforcement officers, representing three different agencies," executed a search warrant at the defendant's home. 539 F.3d at 1078. Most of the officers were in uniform, and all of them were armed. *Id.* Two of the officers told the defendant "that the two of them would like to talk with [Craighead] about the search warrant." *Id.* The officers also explicitly said that Craighead "was not under arrest, that any statement he might make would be voluntary, and that he would not be arrested that day regardless of what information he provided." *Id.* The

25

officers then took Craighead "to a storage room at the back of his house, where [they] could have a private conversation." *Id.* at 1078-79 (alterations in the original) (internal quotation marks omitted). Once in the storage room, the officers closed the door, and one of them stood guard in front of the door. *Id.* at 1079. The officers could not recall whether they reiterated that Craighead was free to leave, and they did not advise him of his *Miranda* rights. *Id.* "During the interview, Craighead admitted that he downloaded child pornography." *Id.*

The court in *Craighead* held that the defendant "was in custody for purposes of *Miranda*." *Id.* at 1089. The court based its decision on the fact that there were agents from several different law enforcement agencies, and the defendant expressed doubt whether the officer who told him he was free to leave had authority over the other agents. *Id.* at 1088. More relevant here, Craighead was in an unfurnished storage room with the only exit blocked by an officer during the interview. *Id.* The court explained that the physical characteristics of the interview location, in addition to the number of officers in Craighead's home, supported that the home was "a police dominated atmosphere," and that Craighead reasonably believed that he was not free to leave. *Id.* at 1088-89.

Blackburn also relies on *State v. Dennis*, 16 Wn. App. 417, 558 P.2d 297 (1976). In *Dennis*, officers executed a search warrant at the defendant's home. 16 Wn. App. at 418. The defendant's wife maintained that after answering the door, one of the officers "inserted his foot between the door and [the] jamb . . . to prevent closure and then entered without invitation." *Id.* at 419. The officer testified that Mrs. Dennis "granted him permission to enter." *Id.* After entering Dennis's home, the officer sat down at a "table which permitted him a view of the kitchen with its refrigerator" where drugs were allegedly being stored. *Id.* Both the defendant and his wife sat down at the table, and "the officer told them he knew of the narcotics sale and that there was a

26

supply of the drug in the refrigerator." *Id.* "[T]he officer requested or suggested that [Dennis] produce the drugs voluntarily and save the officer the trouble of searching." *Id.* Dennis complied and "removed several packages of cocaine from the refrigerator and placed them on the table before the officer." *Id.* At no point did the officer advise Dennis that "they could not leave the premises, nor did [he or his wife] request permission to leave." *Id.* at 420. And there was conflicting testimony whether the officer read Dennis his *Miranda* rights before or after Dennis presented the drugs. *Id.*

We concluded that Dennis was in custody for purposes of *Miranda*. *Id.* at 422. We explained that "even though the conversation took place in the defendant's own apartment, . . . Dennis had [not] been placed under arrest, and the officer avowed they were free to leave at any time, the atmosphere was nevertheless dominated by the officer's unwelcome presence." *Id.* at 421. As a result, Dennis "had reason to believe he was not free to remove anything from the refrigerator and exit the room." *Id.* at 422.

Both *Craighead* and *Dennis* are factually dissimilar from the case at bar. In both cases, the defendants were the subject of the search warrant. *Craighead*, 539 F.3d at 1078; *Dennis*, 16 Wn. App. at 418-19. Here, in contrast, Morse, not Blackburn was the subject of the search warrant. This is significant because after informing Blackburn about the search, officers left Blackburn alone since they did not suspect her of being involved "in any kind of crime." RP (Jan. 26, 2024) at 44. In *Craighead*, the defendant was promptly taken to a back storage room where he was questioned by two officers. 539 F.3d at 1078-79. And in *Dennis* the officer similarly engaged with the defendant shortly after entering the home. 16 Wn. App. at 419-20. That is not the case here. Blackburn was only faced with a comparable situation *after* she had opened the safe and officers suspected her of being involved in a crime. Consequently, all of Blackburn's relevant

27

statements and actions that occurred prior to opening the safe were admissible because Blackburn was not in custody for the purposes of *Miranda*. Blackburn's reliance on these cases fails.

Therefore, we conclude that Blackburn was not subjected to a custodial interrogation without being advised of her *Miranda* rights.

III.      UNLAWFUL POSSESSION OF BUPRENORPHINE WITH INTENT TO DELIVER

Blackburn argues that there is insufficient evidence to convict her of possession of buprenorphine with intent to deliver. We disagree.

The State argues that we should not consider Blackburn's argument because she did not raise this issue below. Generally, courts do not consider unpreserved issues for the first time on appeal. RAP 2.5(a). But sufficiency of the evidence is an exception to this rule. It has been a "longstanding maxim that a criminal defendant may always challenge the sufficiency of the evidence supporting a conviction for the first time on appeal." *State v. Sweany*, 162 Wn. App. 223, 228, 256 P.3d 1230 (2011); *State v. Colquitt*, 133 Wn. App. 789, 795-96, 137 P.3d 892 (2006); *State v. Hickman*, 135 Wn.2d 97, 103 n.3, 954 P.2d 900 (1998); *State v. Alvarez*, 128 Wn.2d 1, 9-10, 904 P.2d 754 (1995). The State's argument is without merit, and we will consider Blackburn's challenge.

To satisfy due process, the State must prove every element of the crimes charged beyond a reasonable doubt. *State v. Smith*, 155 Wn.2d 496, 502, 120 P.3d 559 (2005). The test for determining the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found [the defendant] guilt[y] beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

Under a sufficiency challenge, our review is "highly deferential to the jury's decision" because "questions of credibility, persuasiveness, and conflicting testimony must be left to the jury." *State v. Davis*, 182 Wn.2d 222, 227, 340 P.3d 820 (2014); *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277 (2011). A defendant challenging the sufficiency of the evidence admits "the truth of the State's evidence and accepts the reasonable inferences to be made from it." *State v. O'Neal*, 159 Wn.2d 500, 505, 150 P.3d 1121 (2007). Therefore, we must draw "all reasonable inferences from the evidence in favor of the State and against the defendant." *In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 724, 543 P.3d 821 (2024).

When we evaluate the sufficiency of the evidence supporting a conviction, we consider circumstantial evidence to be as reliable as direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980); *see also O'Neal*, 159 Wn.2d at 506 ("Direct evidence is not required to uphold a jury's verdict; circumstantial evidence can be sufficient."). "[E]ven if the only evidence of guilt is circumstantial, the jury need only be convinced of guilt beyond a reasonable doubt." *State v. Couch*, 44 Wn. App. 26, 30, 720 P.2d 1387 (1986).

"The elements of possession of a controlled substance with intent to deliver under RCW 69.50.401(1) are (1) unlawful possession (2) with intent to deliver (3) a controlled substance." *State v. O'Connor*, 155 Wn. App. 282, 290, 229 P.3d 880 (2010). With respect to the third element, the State must also prove the identity of the controlled substance. *State v. Goodman*, 150 Wn.2d 774, 786, 83 P.3d 410 (2004); *Colquitt*, 133 Wn. App. at 800-01. To determine "[if] the State has met its burden of establishing the identity of" an alleged controlled substance, we rely on a list of *non-exhaustive* factors. *Colquitt*, 133 Wn. App. at 801. These factors include:

> (1) testimony by witnesses who have a significant amount of experience with the drug in question, so that their identification of the drug as the same as the drug in their past experience is highly credible; (2) corroborating testimony by officers or

other experts as to the identification of the substance; (3) references made to the drug by the defendant and others, either by the drug's name or a slang term commonly used to connote the drug; (4) prior involvement by the defendant in drug trafficking; (5) behavior characteristic of use or possession of the particular controlled substance; and (6) sensory identification of the substance if the substance is sufficiently unique.

*Id.* It is not always necessary to have a laboratory test identifying the substance. *See id.* at 800.

Merely possessing a controlled substance in an amount greater than for personal use is insufficient to show an intent to deliver. *State v. Sprague*, 16 Wn. App. 2d 213, 233, 480 P.3d 471 (2021). "At least one additional fact must exist" that suggests the defendant had the intent to deliver. *O'Connor*, 155 Wn. App. at 290 (noting that "a large amount of cash or sale paraphernalia" would satisfy this requirement).

Here, Blackburn argues that because the State did not explicitly make the connection that Suboxone is synonymous with buprenorphine at trial, it cannot establish the identity of the controlled substance beyond a reasonable doubt. When discussing Suboxone at trial, Tully testified that he had "come across Suboxone being sold illicitly" throughout his "years of experience in these types of investigations." RP (Feb. 7, 2024) at 188-89. When explaining how Tully knew the alleged substance at issue was Suboxone, he commented, "'I can see the label on them. They are clearly marked as Suboxone *buprenorphine* sublingual film.'" RP (Feb. 7, 2024) at 152 (emphasis added). Indeed, both exhibits 12 and 18 confirmed Tully's observation. When viewing the evidence in the light most favorable to the State, the evidence supports a reasonable

inference that Suboxone is synonymous with buprenorphine. At a minimum, the jury would have been able to conclude that Suboxone contains buprenorphine as an active ingredient. Blackburn's argument fails.[11]

Blackburn also argues that even if it is accepted that Suboxone is synonymous with buprenorphine, there was insufficient circumstantial evidence to prove the alleged controlled substance was buprenorphine. Blackburn relies on several cases to support her argument: *State v. Hernandez*, 85 Wn. App. 672, 679-81, 935 P.2d 623 (1997) (affirming the defendants' convictions for drug-related offenses because circumstantial evidence supported that they delivered a controlled substance); *State v. Roche*, 114 Wn. App. 424, 431, 59 P.3d 682 (2002) (vacating the defendants' convictions because a state chemist engaged in "evidence tampering and official misconduct"); *In re Pers. Restraint of Delmarter*, 124 Wn. App. 154, 163-67, 101 P.3d 111 (2004) (affirming the defendants' convictions in light of evidence tampering because the defendants confessed to possessing a controlled substance and there were positive field tests on the alleged controlled substance); *Colquitt*, 133 Wn. App. at 794 (reversing a defendant's conviction that was based solely on "speculation and an unverified field test"). These cases are unpersuasive for two reasons.

---

[11] Blackburn points to the fact that there was no testimony addressing the possibility that the Suboxone "reliably contain[ed] buprenorphine rather than counterfeit ingredients." Br. of Appellant at 49. But the jury concluded beyond a reasonable doubt that the controlled substance was what the State alleged it to be. *Martinez*, 171 Wn.2d at 364 (explaining that "questions of credibility, persuasiveness, and conflicting testimony must be left to the jury"). And with respect to the State's burden, it had to establish the alleged substance was buprenorphine beyond a reasonable doubt, not to absolute certainty. *Smith*, 155 Wn.2d at 502. Based on the available evidence in the record, which we view in the light most favorable to the State, we are unpersuaded by Blackburn's argument.

First, Suboxone, the controlled substance at issue in this case, is unlike any of the others contemplated in the cited cases. *Hernandez*, 85 Wn. App. at 678-82 (cocaine and heroin); *Roche*, 114 Wn. App. at 431, 434 (methamphetamine); *Delmarter*, 124 Wn. App. at 157-58 (cocaine and heroin); *Colquitt*, 133 Wn. App. at 792 (cocaine). This is significant because while the other cases dealt with undescriptive bags of a "chunky powdery substance," *Roche*, 114 Wn. App. at 434, 438, or "a small plastic bag with several, white rock like items," *Colquitt*, 133 Wn. App. at 792, Blackburn possessed numerous strips, some of which were contained in manufactured pharmaceutical packaging that was labeled "Suboxone *buprenorphine* sublingual film." RP (Feb. 7, 2024) at 152 (emphasis added); CP at 132-35. There were also "prescription bottles with [the] labels that ha[d] been torn off. . . [that contained] . . . a large number of Suboxone strips." RP (Feb. 7, 2024) at 152. Tully confirmed that Suboxone came in the form of strips that were placed on a user's tongue, which further supports the identity of the controlled substance. *See Colquitt*, 133 Wn. App. at 801 ("[S]ensory identification of the substance if the substance is sufficiently unique.").

Second, Tully's testimony was sufficient to establish "observations of behavior consistent with drug sales." *Id.* at 797. Tully testified that to lawfully obtain Suboxone, a person had to receive a prescription. Tully also explained that it was common for people who received a prescription to sell it rather than use it for themselves. While officers did not find a prescription in this case, Tully remarked that he had never seen an instance where a person legally possessed as much Suboxone as the amount recovered from Blackburn's residence.

Therefore, when viewing the evidence in the light most favorable to the State, we conclude that any rational trier of fact could have found Blackburn guilty of possession of buprenorphine with intent to deliver beyond a reasonable doubt.[12]

CONCLUSION

Accordingly, we affirm in part, reverse in part, and remand for a new trial consistent with this opinion.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, A.C.J.

We concur:

Lee, J.

Glasgow, J.

---

[12] Blackburn's sufficiency of the evidence challenge appears to turn solely on the identity of the controlled substance. The record supports the other elements regarding Blackburn's conviction. For instance, Blackburn acknowledged that she was the only person who had the code to the safe where the alleged controlled substances were recovered. Officers also recovered a large quantity of methamphetamine and Suboxone from Blackburn's residence. And the officers found $12,000 in cash, several scales, and packaging materials. Again, when viewing the facts in the light most favorable to the State, a rational trier of fact could infer that Blackburn was engaged in dealing methamphetamine and Suboxone versus possessing the substances for personal use.